CLINTON (QUIRK v.). See Case No. 11,518.

CLINTON & S. R. CO. (SCOTT v.). See Case No. 12,527.

---

## Case No. 2,900.

### In re CLINTON BRIDGE.

[1 Woolw. 150;[1] 7 Am. Law Reg. (N. S.) 149.]

Circuit Court, D. Iowa. Oct. Term, 1867.[2]

EFFECT OF A STATUTE ON PENDING LITIGATIONS — SUCH A LAW IS NOT UNCONSTITUTIONAL — THE COMMERCIAL CLAUSE—INTERFERENCE WITH JURISDICTION OF COURT.

1. An act declaring a bridge a lawful structure, pending a suit to have it declared a nuisance, has the effect to remove the ground of complaint made against it. By its own terms it seems to do so; for it describes it as a bridge

---

[1] [Reported by James M. Woolworth, Esq., and here reprinted by permission.]

[2] [Affirmed in The Clinton Bridge, 10 Wall. (77 U. S.) 454.]

already erected, and congress must have known of the complaints made against it. It makes lawful the bridge which was before unlawful; and the court must be governed by the law as it is when it is called upon to act.

2. A law declaring lawful a bridge over the Mississippi, which obstructs the navigation of the river, is not unconstitutional because of the treaty with France, by which its free navigation is secured. Such questions are international and political in their character, and belong to the executive and legislative departments of the government.

[Cited in Buckner v. Street, Case No. 2,-098; U. S. v. Tobacco Factory, Id. 16,528; U. S. v. Bridleman, 7 Fed. 902; Bartram v. Robertson, 15 Fed. 214; The Head-Money Cases, 18 Fed. 141; Edye v. Robertson, 112 U. S. 580, 5 Sup. Ct. 253.]

3. A law authorizing such a bridge to be built, and prescribing general rules for its construction and maintenance, is a regulation of commerce, and is within the powers conferred on congress by the commercial clause of the constitution. It was so held in the Wheeling Bridge Case, 18 How. [59 U. S.] 421.

4. Any means by which passengers and merchandise are transported is an element of commerce. This has been repeatedly held in respect of navigation, and congress has legislated on the subject accordingly. The railroad, as much as the steamboat, is a means of interchanging persons and property, which interchange is commerce itself. When railroads become portions of the great highways of our Union, acting an important part in a commerce which embraces many states, to regulate them is to regulate commerce. This is true of a bridge over a great river for the passage of such railroad.

[Approved in Union Pac. R. Co. v. Peniston, 18 Wall. (85 U. S.) 47. Cited in Louisville & N. R. Co. v. Railroad Commission of Tennessee, 19 Fed. 712.]

5. The act is decisive of the case, because it furnishes a rule by which the action of the court is determined, not because it deprives the court of jurisdiction.

[See note at end of case.]

This was a bill in equity, filed by [Richard C.] Gray on the 2d day of March, 1861 [against the Chicago, Iowa and Nebraska Railroad Company and others], complaining of a bridge across the Mississippi river, on the ground that it presents a serious obstruction to the navigation of that river, and asking its abatement as a nuisance. The authority to build the bridge was derived from the state of Illinois, by an act incorporating the Albany Bridge Company, and from the state of Iowa, under its general law on the subject. On the Iowa side of the river, it was located at Clinton. To that point, from Chicago, a railroad was built and operated by the Chicago and Northwestern Railroad Company. Thence west to Cedar Rapids in Iowa, ran the Clinton and Cedar Rapids Railroad, which was already constructed and being operated; and from Cedar Rapids to Omaha, in Nebraska, the Cedar Rapids and Missouri River Railroad was in process of construction. At Omaha, the last mentioned road would, when completed, connect with the Union Pacific Railroad. So that from Chicago, through Illinois, Iowa, and Nebraska, a large and important commerce was be-

ing opened and carried on, all of which crossed the Mississippi upon this bridge. The defendant's answer to the bill came in on the 7th of November, 1864, and very voluminous proofs touching the business done at this point, the manner of the construction of the bridge, its effect upon the river and the navigation thereof, were taken. The testimony having been closed, the cause was set down to be heard upon pleadings, proofs, and exhibits. The cause being in this attitude, on the 27th day of February, 1867, congress passed an act [14 Stat. 412] declaring the bridge a post route, and lawful structure as follows:

"Be it enacted by the senate and house of representatives of the United States of America, in congress assembled, that the bridge across the Mississippi river erected by the Albany Bridge Company, and the Chicago, Iowa, and Nebraska Railroad Company, under the authority of the states of Iowa and Illinois, between the towns of Clinton, Iowa, and Albany, Illinois, shall be a lawful structure, and shall be recognized and known as a post route, upon which also no higher charge shall be made for the transmission over the same of the mails, the troops, and the munitions of war of the United States, than the rate per mile paid for their transportation over the railroads or public highways leading to the said bridge.

"Sec. 2. And be it further enacted, that the draw of said bridge shall be opened promptly. upon reasonable signal, for the passage of boats whose construction shall not be such as to admit of their passage under the permanent spans of said bridge, except when trains are passing over the same; but in no case shall unnecessary delay occur in opening the said draw during or after the passage of trains.

"Sec. 3. And be it further enacted, that in case of any litigation hereafter arising from any alleged obstruction to the free navigation of said river, the cause may be tried before the circuit court of the United States of any state in which any portion of said obstruction or bridge touches.

"Sec. 4. And be it further enacted, that the right to alter or amend this act, so as to prevent or remove all material obstructions to the navigation of said river, by the construction of said bridge, is hereby expressly reserved." 14 Stat. 412.

The defendants now moved the court to dismiss the bill, on the ground that this act took away its jurisdiction to determine the questions involved in it.

Mr. Howe, for motion.
Mr. Grant and Mr. T. D. Lincoln, contra.

Before MILLER, Circuit Justice, and LOVE, District Judge.

MILLER, Circuit Justice. This is a bill in chancery to procure the abatement of the bridge as a nuisance, on the ground that it presents a serious obstruction to the navigation of the Mississippi river. The pleadings are at issue, the depositions all taken, and the case set down for hearing.

The defendants now present a motion to dismiss the bill for want of jurisdiction. This motion is founded on the act of congress of February 27, 1867 (14 Stat. 412), which, it is claimed, takes away the jurisdiction of the court to proceed further in this case. The complainant, on the other hand, maintains, that the act, rightly construed, does not dispose of the present suit; and that, if its true construction has such effect, it is unconstitutional. It is said, that because the third section provides for litigation about the bridge after the passage of the act, and vests jurisdiction thereof in the circuit courts, congress could not have. intended to conclude the question raised by this bill, which was then pending. But the second section of the act makes certain regulations concering the use of the draw in the bridge, and contemplates that suits may grow out of their neglect or violation. It is to this litigation that the third section seems most naturally to refer. At all events, it is a species of litigation to. arise after the passage of the act, to which alone that section, by its own terms, can apply.

The first section of the act, after describing a bridge already erected across the Mississippi river at Clinton. declares, that "it shall be a lawful structure, and shall be recognized and known as a post route." It cannot be doubted that congress was aware of the existence of the bridge, and that it had been complained of as an unauthorized and illegal obstruction to navigation. Undoubtedly, by this act congress intended, so far as it had the power, to remove therefrom the objection of illegality and want of authorization. The declaration that it shall be a lawful structure admits of no other interpretation. The language is almost identical with that used by the same body in reference to the Wheeling bridge, where the supreme court has held that such was its intent. [Pennsylvania v. Wheeling & B. Bridge Co.] 18 How. [59 U. S.] 421.

But it is not necessary to determine whether congress intentionally referred to this suit at the time of passing the act, or whether it was aware that such a suit was pending. If it had the power to make this bridge lawful, which before was unlawful. it has done so in this case; and the court must be governed by the law as it exists at the time when it is called upon to act.

The objections taken to the constitutionality of the act are these: 1. That it violates the obligations of certain treaties between the United States and foreign nations, which in effect declare that the navigation of the Mississippi river shall remain free and unobstructed forever. 2. That no power exists in congress to authorize or regulate bridges over the navigable streams of the

United States. 3. That such special legislation, while a suit is pending in the courts involving the same matter, is an invasion of the rights of the judicial department of the government, as secured by the constitution.

1. In reference to the first of these objections, we need not inquire whether the treaties referred to were designed to affect such cases as the one before us or not; for we are of opinion that whatever obligation they may have imposed upon our government, the courts possess no power to declare a statute passed by congress and approved by the president, void, because it may violate such obligations. See The Amiable Isabella, 6 Wheat. [19 U. S.] 1.

Questions of this class are international questions, and are to be settled between the foreign nations interested in the treaties and the political department of our government. When those departments declare a treaty abrogated, annulled, or modified, it is not for the judicial branch of the government to set it up, and assert its continued obligation. If the court could do this, it could annul declarations of war, suspend the levy of armies, and become a great international arbiter, instead of a court of justice for the administration of the laws of the United States. See Georgia v. Stanton, 6 Wall. [73 U. S.] 50.

2. The second of these objections involves the consideration of the commercial clause, as it is appropriately called, of the constitution. If the determination of the circumstances under which a bridge may be built over a navigable stream, or the prescribing of general rules for its construction and maintenance, be a regulation of commerce, either with foreign nations or among the states, then the enactment under consideration falls within the powers conferred on congress by that clause.

It would be sufficient, in this court, to say that we are concluded on this question by the decision of the supreme court in the Wheeling Bridge Case, already referred to, in that part which expressly holds that the power to declare such a bridge a lawful structure is included within this clause of the constitution. That case was decided when it was first before the supreme court in 1852, and is reported in 13 How. [54 U. S.] 518. Its circumstances at that time were briefly these: A bridge over the Ohio at Wheeling being in process of construction, the state of Pennsylvania, alleging certain circumstances in which the bridge would operate to its special injury, commenced an original suit in the supreme court to have the structure declared a nuisance, and as such its erection enjoined, and it abated. Thereupon the state of Virginia passed an act declaring it lawful, and the validity of this enactment, among other things, was drawn in question. The court found that the state legislation conflicted with that of congress regulating commerce upon the river between the different states,

adjudged the bridge a nuisance, and that it should be abated. Afterwards congress passed an act declaring the bridge a lawful structure, and a post road for the passage of the mails of the United States. A bill being filed to carry the former decree into execution, an injunction was allowed by Mr. Justice Grier against the renewal of work on the bridge, which being disregarded, motions were made in the court at its December term, 1858, for attachment for contempt, and for sequestration; and a counter motion to dissolve the injunction. This brought up the question of the validity and effect of the act of congress. The opinion delivered by Mr. Justice Nelson is found in [Pennsylvania v. Wheeling & B. Bridge Co.] 18 How. [59 U. S.] 421. On the subject of the competency of congress under the commercial clause of the constitution to pass the act, he says: "Since, however, the rendition of this decree, the acts of congress already referred to have been passed, by which the bridge is made a post road for the passage of the mails of the United States, and the defendants are authorized to have and maintain it at its present site and elevation, and requiring all persons navigating the river to regulate such navigation so as not to interfere with it.

"So far, therefore, as this bridge created an obstruction to the free navigation of the river, in view of the previous acts of congress, they are to be regarded as modified by this subsequent legislation; and although it still may be an obstruction in fact, is not so in the contemplation of law. We have already said, and the principle is undoubted, that the act of the legislature of Virginia conferred full authority to erect and maintain the bridge, subject to the exercise of the power of congress to regulate the navigation of the river. That body having, in the exercise of this power, regulated the navigation consistent with its preservation and continuation, the authority to maintain it would seem to be complete. That authority combines the concurrent powers of both governments, state and federal, which, if not sufficient, certainly none can be found in our system of government.

"We do not enter upon the question whether or not congress possess the power, under the authority in the constitution, 'to establish post-offices and post-roads,' to legalize this bridge; for, conceding that no such powers can be derived from this clause, it must be admitted that it is at least necessarily included in the power conferred to regulate commerce among the several states. The regulation of commerce includes intercourse and navigation, and, of course, the power to determine what shall or shall not be deemed, in judgment of law, an obstruction to navigation; and that power, as we have seen, has been exercised consistent with the continuance of the bridge."

There was great disagreement between the judges in their views of the case, in conse-

quence of which the authority of the decision has been much questioned. But this court is bound by the law as the majority of the judges there held it. In the supreme court this would not be the case, the judges sitting there being left to review the ground.

But I will not rest on the authority of that case alone. I think that the proposition declared in it is well founded in principle. The power to regulate commerce is one of the most useful confided to the federal government; and its exercise has done as much as that of any other to create and foster that strongest bond of nationality—a community of interests among the states. The want of it was one of the most pressing necessities which led to the formation of the constitution. The clause has always received, at the hands of the courts and of congress, a construction tending liberally to promote its beneficent object.

The power to regulate commerce, is the power to regulate the instruments of commerce. In the case of Cooley v. Board of Wardens [12 How. (53 U S.) 299], the court says, that "the power to regulate navigation is the power to prescribe rules in conformity with which navigation must be carried on. It extends to the persons who conduct it, as well as to the instruments used." Navigation is here spoken of as one of the subjects of legislation included in the power to regulate commerce. In this view of the subject, congress has passed statutes regulating steamboats, their construction, equipment, officers, and crews, prescribing qualifications of pilots and engineers, limiting the number of passengers they may carry, and prescribing the signals they shall use in passing each other; in short, it has established a minute code for building and navigating those vessels. The right to do this depends wholly on the power vested in congress to regulate commerce, and has never been disputed.

Navigation, however, is only one of the elements of commerce. It is an element of commerce, because it affords the means of transporting passengers and merchandise, the interchange of which is commerce itself. Any other mode of effecting this would be as much an element of commerce as navigation. When this transportation or interchange of commodities is carried on by land, it is commerce, as well as when it is carried on by water; and the power of congress to regulate it is as ample in the one case as in the other. The "commerce among the states," spoken of in the constitution, must, at the time that instrument was adopted, have been mainly of this character; for the steamboat, which has created our great internal commerce on the rivers, was then unknown.

Another means of transportation, equal in importance to the steamboat, has also come into existence since the constitution was adopted. By it, merchandise is transported across states and kingdoms in the same vehicle in which it started. The railroad now

shares with the steamboat the monopoly of the carrying trade. The one has, with great benefit, been subjected to the control of salutary congressional legislation [because it is an instrument of commerce].[3] Is there any reason why the other should not be? However this question may be answered in regard to that commerce which is conducted wholly within the limits of a state, and which is therefore neither foreign commerce, nor commerce among the states, it seems to me that when these roads become parts of the great highways of our Union, acting an important part in a commerce which embraces many states, and destined, as some of these roads are, to become the channels through which the nations of Europe and Asia shall interchange their commodities, there can be no reason to doubt that to regulate them is to regulate commerce both with foreign nations and among the states, and that to refuse to do this is a refusal to discharge one of the most important duties of the federal government. As already intimated, the shackles with which the different states fettered commerce in their selfish efforts to benefit themselves at the expense of their confederates, was one of the main causes which led to the formation of our present constitution. The wonderful growth of that commerce since it has been placed exclusively under the control of the federal government, has justified the wisdom of our fathers. But are we to remit the most valuable part of it to the control of the states through whose territories it must be conducted, and to all the vexations and burdens which they may impose? And must all this be permitted, because the carrying is done by a method not thought of when the constitution was framed?

For myself, I must say that I have no doubt of the right of congress to prescribe all needful and proper regulations for the conduct of this immense traffic, over any railroad which has voluntarily become part of any of those lines of inter-state communication, or to authorize the creation of such roads, when the purposes of inter-state transportation of persons and property justify or require it.

The bridge which we are now considering constitutes a part of an unbroken iron track from the Atlantic seaboard to the Missouri river, over which many thousand persons and millions of dollars' worth of merchandise are carried every year. Within two or three years, it is confidently believed, this track will be without break from the Atlantic to the Pacific ocean, and will carry the commerce of continents. Can it be seriously doubted that, in reference to this commerce, the magnitude of which we can hardly conceive, congress can prescribe the place where the bridge shall be built, over which it crosses the Mississippi, and can make such

---

[3] [From 7 Am. Law Reg. (N. S.) 149.]

regulations concerning its character and its use as shall be best for the commerce of the river, as well as of the road? The commerce of the river, and the commerce across the river, are both commerce among the states, and may be regulated by congress, and when any regulation is necessary, should be so regulated.

And in these views I am confirmed by the language held by the federal courts on this provision of the constitution. In nearly every case the question was as to the force and effect of state legislation, when it conflicted, or was supposed to conflict, with congressional legislation. But the judges, in their opinions, often speak of the power of congress under the commercial clause.

The great case of Gibbons v. Ogden, 9 Wheat. [22 U. S.] 1, arose upon an act of the legislature of New York, granting to Fulton, the inventor, and Livingston, his associate, the exclusive right to navigate the waters of that state with boats propelled by steam; and the question was whether this act conflicted with the laws of the United States regulating the coasting trade. Chief Justice Marshall delivered the opinion of the court, and supported its decision by reasoning so cogent that it has never been questioned. He defines commerce in terms so comprehensive as to include within its meaning railroads, as well as steamboats, of which he is speaking. He says: "Commerce undoubtedly is traffic; but it is something more—it is intercourse. It describes the commercial intercourse between nations, and parts of nations, in all its branches; and is regulated by prescribing rules for carrying on that intercourse." Id. 189. And again, "These words comprehend every species of commercial intercourse between the United States and foreign nations. No sort of trade can be carried on between this country and any other, to which this power does not extend." Id. 193, 194. "In regulating commerce with foreign nations, the power of congress does not stop at the jurisdictional lines of the several states. It would be a very useless power if it could not pass those lines. If congress has the power to regulate it, that power must be exercised wherever the subject exists. If it exists within the states. if a foreign voyage may commence or terminate at a port within a state, then the power of congress may be exercised within a state." Id. 195. "The power of congress, then, comprehends navigation within the limits of every state in the Union, so far as that navigation may be connected with commerce with foreign nations or among the several states." Id. 197. And again, "It is the power to regulate, that is, to prescribe, the rule by which commerce is governed." Id. 196. "Vessels," said the chief justice, "have always been employed to a greater or less extent in the transportation of passengers, and have never been supposed to be on that account withdrawn from the control or protection of congress. Packets which ply along the coast, as well as those which make voyages between Europe and America, consider the transportation of passengers as an important part of their business. Yet it has never been suspected that the general laws of navigation did not apply to them." And again, "A coasting vessel employed in the transportation of passengers, is as much a portion of the American marine as one employed in the transportation of a cargo." Id. 215, 216.

U. S. v. Coombs, 12 Pet. [37 U. S.] 72, was an indictment under the act punishing thefts of goods belonging to vessels in distress, although committed above high-water mark. Upon the question of the competency of congress to pass such act, Mr. Justice Story, delivering the opinion of the court, said, "But we are of opinion that under the clause of the constitution giving power to congress 'to regulate commerce with foreign nations, and among the several states,' congress possessed the power to punish offences of the sort which are enumerated in the ninth section of the act of 1825 [4 Stat. 116], now under consideration. The power to regulate commerce includes the power to regulate navigation, as connected with the commerce of foreign nations, and among the states. It was so held and decided by this court, after the most deliberate consideration, in the case of Gibbons v. Ogden, 9 Wheat. [22 U. S.] 189–198. It does not stop at the mere boundary line of a state, nor is it confined to acts done on the water, or in the necessary course of the navigation thereof. It extends to such acts done on land, which interfere with, obstruct, or prevent the due exercise of the power to regulate commerce and navigation with foreign nations, and among the states. Any offence which thus interferes with, obstructs, or prevents such commerce and navigation, though done on land, may be punished by congress, under its general authority to make all laws necessary and proper to execute its delegated constitutional powers."

In Corfield v. Coryell [Case No. 3,230], Mr. Justice Washington, in the course of his opinion, said, "The first question is, whether this act, or either section of it, is repugnant to the power granted to congress to regulate commerce. Commerce with foreign nations, and among the several states, can mean nothing more than intercourse with those nations, and among those states, for purposes of trade, be the object of the trade what it may; and this intercourse must include all the means by which it can be carried on, whether by the free navigation of the waters of the several states, or by a passage over land through the states, where such passage becomes necessary to the commercial intercourse between the states. It is this intercourse which congress is invested with the power of regulating, and with which no state has a right to interfere."

In Cooley v. Board of Wardens of Port of

Philadelphia, 12 How. [53 U. S.] 299, the supreme court, Mr. Justice Curtis delivering its opinion, held that a regulation of pilots and pilotage is a regulation of commerce within the grant to congress of the commercial power; and he says, "The power to regulate navigation is the power to prescribe rules in conformity with which navigation must be carried on. It extends to the persons who conduct it, as well as to the instruments used."

In Gilman v. Philadelphia, 3 Wall. [70 U. S.] 713, it was held, that "the power to regulate commerce comprehends the control for that purpose, and to the extent necessary, of all the navigable waters of the United States which are accessible from a state other than those on which they lie; and includes, necessarily, the power to keep them open and free from any obstruction to their navigation, interposed by the states or otherwise. And it is for congress to determine when its full power shall be brought into activity, and as to the regulations and sanctions which shall be provided."

And while conceding to the states the power to authorize the construction of bridges, turnpikes, streets, and railroads, in answer to the objection that such a concession to the states would arm them with a power potent for evil and liable to abuse, it was expressly said, that "congress may interpose, whenever it shall be deemed necessary, by general or special laws. It may regulate all bridges over navigable waters, remove offending bridges, and punish those who shall thereafter erect them. Within the sphere of their authority, both the legislative and judicial power of the nation are supreme. A different doctrine finds no warrant in the constitution, and is abnormal and revolutionary."

In these cases, the judges have been speaking of navigation. But the terms of the constitution are not confined to that mode of conducting commerce. Any other means of commerce are obviously within its terms, and the language of the extracts above given either distinctly state or clearly import such fact. I have shown that railways are now means of inter-state commerce as well as steamboats. Their iron tracks, extending from ocean to ocean, are no more limited by political boundaries than are the rivers which rise in one state and flow through others to the sea. Over the former, propelled by one application of the motive power of steam, roll many cars, laden with the products and fabrics of one section of the country for the supply of the wants of a distant section. Through the latter, propelled by another application of the same power, ply the steamers, laden in like manner, and discharging a like beneficent office. Where lies the difference between them? Why should not the power which regulates one extend to the control of the other?

Whatever might be my individual opinion, as a member of the supreme court, upon the proposition that the statute under consideration is an invasion of the judicial powers of this court, I am, while sitting here, bound by the decision in the Wheeling Bridge Case, already referred to, where this question was raised and decided.

The statement of this case above shows that the interference by congress there was even after the decree of the court. Mr. Justice Nelson, considering the objection urged, that the act of congress had the effect and operation to annul the judgment of the court, shows that the bridge was unlawful because its erection was a violation of the federal legislation, and that when this legislation was modified, it was unlawful no longer. He says, "If, in the meantime, since the decree, this right has been modified by the competent authority, so that the bridge is no longer an unlawful obstruction, it is quite plain the decree of the court cannot be enforced. There is no longer any interference with the enjoyment of the public right inconsistent with law, no more than there would be where the plaintiff himself had consented to it after the rendition of the decree."

The act of February 27, 1867 [14 Stat. 412], then, in our opinion, must finally dispose of this case. But it does so by furnishing a rule of law on which it must be decided, and not by depriving the court of jurisdiction. When reached for hearing, therefore, the bill must be dismissed, not for want of jurisdiction, but on the merits. For this and other reasons the present motion cannot prevail. Motion overruled.

The motion having been thus disposed of, the cause came on to be heard, finally, upon the record. The complainant, by his counsel, presented the depositions and other evidence which he had taken to support his bill, claiming that it showed that he had a special interest in the navigation of the Mississippi river at the point where the bridge was, and that the bridge was an obstruction to the navigation of the river by steamboats, and was specially injurious to him, as a navigator thereof by such boats. To the introduction of this testimony the defendants objected, because, they said, it was immaterial, since, by the act of February 27, 1867 [14 Stat. 412], congress had declared the bridge a lawful structure. It was admitted that the bridge formed a link in a chain of railroads extending from Chicago to the Missouri river. The court sustained the objection, and refused to hear the proofs offered. Thereupon a decree was made dismissing the bill. Bill dismissed.

[NOTE. Congress has power to interfere and legalize the bridge, under its authority to regulate commerce; it was evidently its intention to so legalize it by the act of Feb. 27, 1867 (14 Stat. 412), and the effect of the passage of the act pending the suit furnished a rule of decision for the court. Per Mr. Justice Nelson on the appeal of complainant from the decree

herein to the supreme court; following the Wheeling Bridge Case, 18 How. (59 U. S.) 421. The Clinton Bridge, 10 Wall. (77 U. S.) 454.]

---

CLINTON LINE EXTENSION R. CO. (GRIFFIN v.). See Case No. 5,816.

CLINTON LINE R. CO. (LUDLOW v.). See Case No. 8,600.

CLINTON, The MARY. See Case No. 9,203.

CLIPPER MOWER, ETC., CO. (WHEELER v.). See Case No. 17,493.