RAILROAD COMPANY *v.* PENISTON.

1. The exemption of agencies of the Federal government from taxation by the States is dependent, not upon the nature of the agents, nor upon the mode of their constitution, nor upon the fact that they are agents, but upon the effect of the tax; that is, upon the question whether the tax does in truth deprive them of power to serve the government as they were intended to serve it, or hinder the efficient exercise of their power.   A tax upon their *property* merely, having no such necessary effect, and leaving them free to discharge the duties they have undertaken to perform, may be rightfully laid by the States.   A tax upon their *operations* being a direct obstruction to the exercise of Federal powers may not be.

2. This doctrine applied to the case of a tax by a State upon the real and personal property, as distinguished from its franchises, of the Union Pacific Railroad Company, a corporation chartered by Congress for private gain, and all whose stock was owned by individuals, but which Congress assisted by donations and loans, of whose board of directors the government appoints two, which makes annual reports to the government, whose operations in laying, constructing, and working its railroad and telegraph lines, as well as its rates of toll, are subject to regulations imposed by its charter, and to such further regulations as Congress may hereafter make; on whose failure to comply with the terms and conditions of its charter, or to keep the road in repair and use, Congress may assume the control and management thereof, and devote the income to the use of the United States; the loan of the United States to which, amounting to many millions, is a lien on all the property, and on failure to redeem which loan, the Secretary of the Treasury is authorized to take possession of the road with all its rights, functions, immunities, and appurtenances, for the use and benefit of the United States; and, finally, where all the grants made to the company are declared to be upon the condition that, besides paying the government bonds advanced, the company shall keep the railroad and telegraph lines in repair and use, and shall at all times transmit dispatches and transport mails, troops,

and munitions of war, supplies and public stores for the government, whenever required to do so by any department thereof; and that the government shall have the preference at rates not to exceed those charged to private parties, and payable by being applied to the payment of the bonds aforesaid; and in addition to which control, and the obligations and liabilities of the company, Congress, not forbidding a State tax, reserves the right to add to, alter, amend, or repeal the charter.

3. The unorganized territory in Nebraska west of Lincoln County and the unorganized county of Cheyenne having been attached by statute to the county of Lincoln, in Nebraska, for *revenue* purposes, the authorities of Lincoln County were the proper authorities to levy taxes upon property thus placed under their charge.

APPEAL from the Circuit Court for the District of Nebraska; the case being thus:

By act of Congress of July 1st, 1862,* entitled "An act to aid in the construction of a railroad and telegraph line from the Mississippi River to the Pacific Ocean, and to secure the government the use of the same for postal, military, and other purposes," Congress incorporated certain individuals, their associates and successors, as the "Union Pacific Railroad Company," with authority to build a continuous railroad and telegraph from a point on the one hundredth meridian to the western boundary of Nevada Territory. The act fixed the amount of the capital stock and shares, and declared that "the stockholders should constitute said body politic and corporate." The government had no stock in the road, though through the President of the United States it was to appoint two directors, not stockholders, out of fifteen, which the charter provided for as the number to be appointed in all. Annual reports were to be made to the Secretary of the Treasury. The act granted to the company the right of way through the public lands, and "for the purpose of aiding in the construction of said railroad and telegraph line, and to secure the safe and speedy transportation of the mails, troops, munitions of war, and the public stores thereon," made to it an extensive grant of lands, and provided for the issuing of patents therefor. And

---

* 12 Stat. at Large, 489.

for the same purposes the United States agreed to, and did issue its 6 per cent. bonds, payable in thirty years, to the company, to the amount of $16,000 per mile, for each section of forty miles; which bonds the original act declared " shall, *ipso facto*, constitute a first mortgage on the whole of the railroad and telegraph, together with the rolling stock, fixtures, and property of every kind," and made specific provision as to proceedings on the failure of the company to redeem the bonds.

By an act of July 2d, 1864,* this was changed, and the company authorized to issue its "first mortgage bonds to an amount not exceeding the bonds of the United States," and the lien of the bonds of the United States was declared to be subordinate to the bonds so issued by the company, with the exception relating to the transportation of dispatches, troops, mails, &c., for the government.

The grants to the company were declared by the original act to be made upon condition that the company shall (1) pay the bonds of the United States at maturity; (2) keep their line and road in repair and use; (3) "transmit dispatches over said telegraph line, and transport mails, troops, and munitions of war, supplies, and public stores upon said railroad for the government," &c., giving the government the preference at fair and reasonable rates of compensation, not exceeding those charged to private individuals, the amount thus earned to be applied in payment of the bonds, as well as 5 per cent. of the net earnings of the road after its completion.

By the seventeenth section of the same act it was provided that if the road, when finished, should for any unreasonable time be permitted to remain out of repair, or unfit for use, Congress should have authority to put the same in repair and use, and from the income of the road reimburse the government for expenditures thus caused.

The eighteenth section provided that when the net earnings of the road should exceed 10 per cent. of its cost, Con-

---

* 13 Stat. at Large, 356.

gress might reduce, fix, and regulate rates of fare thereon, and declared that "the better to accomplish the object of this act, to wit, to promote the public interest and welfare by the construction of said railroad and telegraph line, and keeping the same in working order, and to secure the government at all times (but particularly in times of war) the use and benefits of the same for postal, military, and other purposes, Congress may at any time, having due regard for the rights of said companies named herein, add to, alter, amend, or repeal this act."

The act also contained provisions, that so far as the public and government were concerned the railroad and branches should be worked as one connected and continuous line.

There was no provision, in any act of Congress relating to this company, respecting the taxation of it or its property by the States through which its roads might run.

The road was completed and put in operation in May, 1869, and with the Central Pacific Railroad formed a continuous line from the Missouri River and the Eastern States to California and the Pacific, thus uniting the extremities of the country. At the time of granting the charter, the territory over which this line was projected all belonged to the United States. But Nevada was admitted into the Union as a State in 1864, and Nebraska in 1867, and the road, as constructed, crosses the latter State in its whole breadth, from east to west.

So far as to the history of the Union Pacific Railway. Now as to a certain tax laid upon it, the subject of this suit.

On the 15th of February, 1869, the legislature of Nebraska passed an act "to define the western boundary of Lincoln County," which, after defining it, provided,

"That all the unorganized country lying west of the western boundary of Lincoln, and east of the east line of Cheyenne County, and south of the North Platte River be, and the same is hereby, attached to the said county of Lincoln, for judicial and revenue purposes, and that the county of Cheyenne be, and

the same is hereby, attached, for judicial and revenue purposes, to said county of Lincoln."*

In this state of things the authorities of Lincoln County, in the State of Nebraska, under a revenue law of the State, passed on the same 15th of February, 1869, laid a tax upon the property of the railroad company, embraced within the taxation, upon the valuation of $16,000 per mile, for a length of one hundred and seventy-six miles.†

The property of the company thus rated and taxed consisted of its road-bed, depots, wood-stations, water-stations, and other realty; telegraph-poles, telegraph-wires, bridges, boats, books, papers, office furniture and fixtures, money and credits, movable property, engines, &c.

The population of Lincoln County and all the attached territory, by the census of 1870, was 1352 persons. The whole amount of the tax list was $4,081,904, of which was

Property of the company, . . . . . .. $3,936,000
Property of other taxpayers, . . . . . 145,904

The tax levied by the county was $41,328 upon the company's property, and $6350.45 upon the property of other taxpayers.

The tax levied upon the company's property was distributed under the following heads or purposes of taxation:

For State general fund, . . . . . . . $7,872
For State sinking fund, . . . . . . . 3,936
For State school fund. . . . . . . . 3,936
For county general fund, . . . . . . . 19,680
For county sinking fund, . . . . . . . 3,936
And for district school purposes, . . . . .. 1,968

The length of the company's road lying within the territory ascribed to Lincoln County for taxation, was as follows: In Lincoln County, eight miles; in Cheyenne County (unorganized), one hundred and five miles; between the two

---

* Laws of Nebraska, 1869, p. 249.

† The tax was, in fact, laid on two hundred and forty-six miles; but, as it was admitted by the defendant that there was seventy miles of excessive computation, the only question here was as to the tax on the remaining one hundred and seventy-six miles.

counties, sixty-three miles; making a total of one hundred and seventy-six miles.

In this state of things, one Peniston, Treasurer of Lincoln County, being about to collect the tax laid, the Union Pacific Railroad Company filed a bill in the Circuit Court of the United States in the District of Nebraska against him, to restrain his doing so; assigning as grounds for the bill among others—

That the State of Nebraska had no power to subject to taxation for State purposes the road-bed, rolling-stock, and other property necessary for the use and operation of the road; such power resting, as it was asserted by the bill, exclusively in the government of the United States.

That Lincoln County was not by law authorized to tax any portion of the road-bed or property of the company, except such as was situate within its geographical limits.

The cause was heard upon pleadings and agreed proofs, and the Circuit Court refused to restrain the collection of the tax against the one hundred and seventy-six miles of the road, holding the same to have been lawfully imposed, and the property of the company to be open to State taxation. Upon this decree being brought here by the present appeal, the following errors were assigned:

*First.* That it was error to hold the tax a valid imposition upon the property of the Union Pacific Railroad Company subjected to it, such property being exempt from State taxation, by virtue of the incorporation of the company by the United States as a means for the performance of certain public duties of the government, enjoined and authorized by the Constitution.

*Second.* That it was error to hold the rating and taxing of the property of the company, outside the county of Lincoln, by the authorities of that county, valid and lawful under the legislation of the State.

*Mr. W. M. Evarts, for the appellant:*

I. The tax and the statute of Nebraska, so far as it au-

thorized the tax, were void, and the company's property should have been relieved, and protected therefrom by the judgment of the court.

1. The railroad company was created and endowed by Congress, with its franchises, powers, and property, as a means, instrument, and agency for the execution of the powers vested in the General government by the Constitution of the United States.

2. At the time of the passage of the act of Congress, under which the corporate powers were created and conferred, the government of the United States exercised the sole and undivided dominion over the territories to be traversed by the railroad, or affected by the powers of this corporation or their administration.

3. The tax here authorized by the statute of Nebraska, and actually laid by the county of Lincoln, is rated and assessed upon whatever constitutes the property and the means of the company as collected, combined, prepared, and worked (under or by authority of the act of Congress) as the instrument and agent of the General government, for the execution of its constitutional powers and the performance of its constitutional duties, so far as this instrument and agent has its structure, capital in any and every form of use or investment, and its operations within the local range of the taxing power.

The theory of the taxation is an apportionment of the total and aggregated means of the corporation per mile of its railroad, and a valuation and taxation of the ratable share of the length of the railroad found within the different counties of the State.

4. If the tax be looked at in its circumstances as well as in its principle, it is not too much to say that the introduction and operation of this means and agency of the General government within the territorial limits of what now constitutes the State of Nebraska, is made the occasion, and the means and agent made the subject, of taxation for local and general State purposes, in exoneration of the property of the population which should bear those burdens.

II. The settled doctrines of this court, in expounding the relations which the means, instruments and agencies, created by the General government for the execution of its constitutional powers bear to the States, and taxation under the authority of the States, exempt the Union Pacific Railroad Company from the taxation to which it is sought to be subjected.

The *principles* established in the celebrated cases of *McCulloch* v. *Maryland*,\* and *Osborn* v. *Bank of United States*,† stand . unbroken and impregnable. Neither the force of their reason, nor the weight of their authority, is, in the .least, abated by any subsequent adjudications *in pari materia.*

The late Chief Justice Chase thus speaks of these decisions :‡

"That Congress may constitutionally organize or constitute agencies for carrying into effect the National powers granted by the Constitution; that the agencies may be organized by the voluntary association of individuals, sanctioned by Congress; that Congress may give to such agencies, so organized, corporate unity, permanence, and efficiency; and that such agencies in their being, capital, franchises, and operations, are not subject to the taxing power of the States, have ever been regarded, since those decisions, as settled doctrines of this court.

"Those decisions were the judgments of great men and of great judges. They were pronounced by the most illustrious of their number, and are distinguished by his peculiar clearness and cogency of reasoning. For nearly half a century the principles vindicated by them have borne the keen scrutiny of an enlightened profession and the sharp criticism of able statesmen, and they remain unshaken. All the judges who concurred in them have descended long since into honored graves, but their judgments endure, and gathering vigor from time and general consent, have acquired almost the force of constitutional sanctions."

A concise and authoritative statement of what principles were decided in *McCulloch* v. *Maryland*, and *Osborn* v. *Bank*

---

\* 4 Wheaton, 316.                    † 9 Id. 738.
‡ Van Allen *v.* The Assessors, 3 Wallace, 591.

*of the United States*, is given by this court in its opinion, as delivered by Marshall, C. J., in *Weston* v. *Charleston*.*

"We will not repeat the reasoning which conducted us to the conclusion thus formed; but that conclusion was, that all subjects to which the sovereign power of a State extends, are objects of taxation; but those over which it does not extend, are, upon the soundest principles, exempt from taxation.

"'The sovereignty of a State extends to everything which exists by its own authority, or is introduced by its permission;' but not to those means which are employed by Congress to carry into execution powers conferred on that body by the people of the United States.

"The attempt to use the power of taxation on the means employed by the government of the Union in pursuance of the Constitution, is in itself an abuse, because it is the usurpation of a power which the people of a single State cannot give.

"The States have no power by taxation, or otherwise, to retard, impede, burden, or in any manner control the operation of the constitutional laws enacted by Congress, to carry into execution the powers vested in the General government."

III. But, if the State act be constitutional, in its application to the property of this company subjected to it, it is submitted that the property *outside of the county of Lincoln* is not lawfully taxable by the authorities of that county under the laws of the State.

*Mr. J. M. Woolworth, contra:*

The main objection to these taxes is, that they are imposed upon an agent of the Federal government. The objection cannot be supported as an original proposition. We concede that those agencies which Congress has established for the purpose of carrying into execution the powers conferred in the Federal Constitution, are in no way liable to interference by the States. This court has reiterated that principle many times, and with great emphasis. But there is another principle which this court has as often and as emphatically asserted, and which is equally necessary to the

---

* 2 Peters, 466.

harmonious relations of the State and Federal powers. It is, that the taxing power exists in the States unrestricted by the Federal Constitution or government, except as to the means necessary to the latter to discharge its functions.

This matter received full exposition from this court (Chase, C. J., speaking for it), in *Lane County* v. *Oregon.** 

These two principles are fundamental in our complex system :

1. The taxing power of a State extends to every matter of value within its sovereignty.

2. But that power cannot reach those agencies which are employed by Congress to carry into execution the powers conferred in the Federal Constitution.

These principles are coefficient. By the one, the just and necessary powers of the States, by the other the just and necessary powers of the Nation are preserved. But they are not co-ordinate. The first is the rule, the second the exception thereto. It devolves upon those who would withdraw "any property, business, or persons, within their respective limits, from the taxing power of the States," to show the same to be within the exception.

But there are many agencies of the Federal government which do not enjoy any exemption whatever from taxation by the States. They do not claim such exemption, even in respect of property which they use when serving the government.

The steamship on the ocean, which bears the ambassador to a foreign court, and the dispatches by which the diplomatic intercourse of the nation is guided, are agents of the government, and discharge most necessary, valuable, and efficient service. The railroad companies, in every one of whose trains is a postal car, bearing the orders of the executive to subordinate officers scattered all through the wide country, and by which the domestic policy and operations of the government are directed, are its agents, also dis-

---

* 7 Wallace, 71; and see the previous cases of Nathan v. Louisiana, 8 Howard, 73; Hamilton Company v. Massachusetts, 6 Wallace, 632.

charging most necessary, valuable, and efficient service. The stage-coach upon the frontier, taking up and carryi g into remote parts these orders, so that from this centre the volitions and pulsations are obeyed and felt to the extremities of the land, shares in the vast service of the republic. And, for all this service, these agents, and thousands of others like them, are paid by the government. Not a small proportion of their earnings, and the dividends which they distribute among their stockholders, is derived from the government. They even pay to the State taxes upon these earnings. They have conveniences for doing this service, used for this service exclusively; the steamship, apartments; the railroad, postal cars; the stage-coach, wagons; and they pay taxes thereon; and yet they never claim exemption from State taxes. Or if one of them, the Kansas Pacific Railroad, is any exception, if it has claimed exemption on that ground, it stands solitary and alone in asserting such claim, and it has signally failed in establishing it.*

But, as all know, there are agencies to which such exemption is conceded. The line of separation is clearly drawn by Chief Justice Marshall in *Osborn* v. *The Bank of The United States*.† He says:

"The foundation of the argument in favor of the right of a State to tax the bank, is laid in the supposed character of that institution. The argument supposes the corporation to have been originated for the management of an individual concern, to be founded upon contract between individuals, having private trade and private profit for its great and principal object.

"If these premises were true, the conclusion drawn from them would be inevitable. This mere private corporation, engaged in its own business, with its own views, would certainly be subject to the taxing power of the State, as any individual would be; and the casual circumstance of its being employed by the government in the transaction of its fiscal affairs, would no more exempt its private business from the operation of that power, than it would exempt the private business of any individual employed in the same manner. But the premises are not

---

* Thompson *v.* Railroad Company, 9 Wallace, 579.   † 9 Wheaton, 859.

true. The bank is not considered as a private corporation, whose principal object is individual trade and individual profit, but as a public corporation, created for a public and national purpose. That the mere business of banking is, in its own nature, a private business, and may be carried on by individuals or companies, having no political connection with the government, is admitted; but the bank is not such individual or company. It was not created for its own sake, or for private purpose. . . .

"Why is it that Congress can incorporate or create a bank? This question was answered in the case of *McCulloch* v. *The State of Maryland*. It is an instrument which is 'necessary and proper' for carrying on the fiscal operations of government."

From the exposition of the relations and immunities of the agencies of the government, traced in the case cited, these principles are deducible:

1. A private corporation, whose principal object is individual trade and individual profit, is not exempted from State taxation by the casual circumstance of being employed by the government in the transaction of its fiscal affairs.

2. While it is true that the agent entitled to exemption may transact private business, its capacity so to do must be an incident to its agency, and be in aid thereof.

3. Its operations in transacting private business must be necessary to its character and efficiency, as a machine employed by the government.

But it is not all of the property of any agents of the Federal government that may be withdrawn from the taxing power of the States. The Bank of the United States was a fiscal agent of the government; it bore a most intimate relation to that government; and yet in *McCulloch* v. *Maryland*,* Marshall, C. J., said:

"This opinion does not deprive the States of any resources which they originally possessed. It does not extend to a tax paid by the real property of the bank, in common with other real property within the State."

---

* 4 Wheaton, 436.

And again, in *Osborn* v. *The Bank of the United States*,* he said, that the local property of the bank may be taxed by the State, the same as the property of other citizens.

But there is a position in which the Federal officer is entitled to the protection of the Federal power. While the property of the officer in general is subject to State taxation, his salary is entirely exempt therefrom.† And the same is true of the corporate agent. If " the tax be upon its operations, and consequently upon the operation of an instrument empowered by the government of the Union, to carry its powers into execution," then the tax is unconstitutional. The reason of the rule marks its limitations. The National government must be free to use such means as it selects, to carry out its functions, else it cannot exist. When a State tax impairs the efficiency of any instrumentality which Congress selects to carry out the legitimate purposes of the Federal government, it is unconstitutional. When it does not have that effect, it is within the competency of the State to impose it.

Miller, J., delivering the unanimous opinion of the court, in *National Bank* v. *Commonwealth*,‡ one of the cases of the bank taxes, distinguishes the cases in the way we do, where the State may and where it may not tax. He says:

"It is argued that the banks, being instrumentalities of the Federal government, by which some of its important operations are conducted, cannot be subjected to such State legislation. It is certainly true that the Bank of the United States, and its capital, were held to be exempt from State taxation on the ground here stated; and this principle, laid down in the case of *McCulloch* v. *The State of Maryland*, has been repeatedly affirmed by the court. But the doctrine has its foundation in the proposition, that the right of taxation may be so used in such cases, as to destroy the instrumentalities by which the government proposes to effect its lawful purposes in the States; and it certainly cannot be maintained that banks, or other corporations

---

* 9 Wheaton, 867.

† Dobbins v. The Commissioners of Erie County, 16 Peters, 435.

‡ 9 Wallace, 353, 361.

or instrumentalities of the government, are to be wholly with-drawn from the operation of State legislation. The most important agents of the Federal government are its officers; but no one will contend that when a man becomes an officer of the government he ceases to be subject to the laws of the State. The principle we are discussing has its limitation; a limitation growing out of the necessity on which the principle itself is founded. That limitation is, that the agencies of the Federal government are only exempted from State legislation so far as that legislation may interfere with or impair their efficiency, in performing the functions by which they were designed to serve that government. Any other rule would convert a principle founded alone in the necessity of securing to the government of the United States the means of exercising its legitimate powers, into an unauthorized and unjustifiable invasion of the rights of the States. The salary of a Federal officer may not be taxed; he may be exempted from any personal service which interferes with the discharge of his official duties, because those exemptions are essential to enable him to perform those duties. But he is subject to all the laws of the State which affect his family or social relations, or his property; and he is liable to punishment for crime, though that punishment be imprisonment or death. So of the banks. They are subject to the laws of the State, and are governed in their daily course of business, far more by the laws of the State than of the nation. All their contracts are governed and construed by State laws. Their acquisition and transfer of property, their right to collect their debts, and their liability to be sued for debts, are all based on State laws. It is only when the State law incapacitates the banks from discharging their duties to the government that it becomes unconstitutional."

Indeed, it is believed that no case adjudged by this court can be found, of a tax on the property of a third party—meaning by this term some agency, other than an integral part of the machinery of government—made use of by the National government, which has been held invalid. The tax in question, in *McCulloch* v. *Maryland*, and *Osborn* v. *The United States Bank*, was upon the operations of the bank, and not upon its property.

And in one of the cases of the bank tax,* the taxation of the present national banks has been supported upon the same theory : the theory, to wit, that it was upon the new use, in the business of banking, to which the Federal bonds were put, and not upon the bonds nor upon the banks that the taxes were imposed.

It may be that the language of some of the judges, and even the reasoning which they have pursued, seem to favor the doctrine of total exemption of the property of an agent of the National government from State taxes. But, as Chase, C. J., said in *Thompson* v. *The Pacific Railroad,* these decisions are limited to the cases before the court.

It is obvious, upon the principle of the cases above cited, that there are agencies of the government, like the old Bank of the United States, the nature of which places them beyond the reach of the States. But there are other agencies, as the new banks, whose principal business is private, and the public business is an incident thereto, which cannot be placed in the same category. As to this latter class, it is not too much to insist that exemption from State regulation should be secured by express direction of Congress; that if Congress does not in terms grant the exemption the State sovereignty is not displaced. It is not needful to this case, to go through the judgments of this court in order to ascertain whether the State power is displaced without a direct enactment of Congress to that effect. There was a long disagreement between the judges on this subject.† But in *Gilman* v. *Philadelphia,*‡ Swayne, J., delivering the opinion of the court, assigned as one of the reasons for sustaining the State law authorizing the bridge, against objections that it conflicted with the commercial power of the nation, the fact that " Congress may interpose whenever it shall be deemed necessary, by general or special laws," the inference being, that until such interposition the power of the State must be respected; and in *Woodruff* v. *Parham,*§ Miller, J., also

---

* Van Allen *v.* The Assessors, 3 Wallace, 573.

† See the License Cases, 5 Howard, 504.          ‡ 3 Wallace, 713.

§ 8 Wallace, 123, 140.

speaking for the court, pretty clearly intimates the same view.

Turning now to the immediate case before us. Is this railroad company entitled to exemption from State taxation because it is an agency of the Federal government?

It is a private corporation whose principal object is individual trade and individual profit. True, it is incorporated by Congress; but, when regard is had to the circumstances, this fact has no significancy. It was authorized to build a road from a point on the one hundredth meridian* to "the western boundary of Nevada Territory." At that time, and when the amendatory act of 1864 was passed, that whole section was territory not within any State. Again: there was a careful abstinence from the claim of any power to authorize the building of a road within any State. It was important, in order to secure all the advantages of the work, to construct parts of it and branches of it in States; but those parts and those branches were to be built by State corporations, and not by the Union Pacific Railroad Company appellant here.

The Central Pacific, a California corporation, was to build from the Pacific coast, or the headwaters of the Sacramento, to the eastern boundary of California.† The Leavenworth, Pawnee, and Western, a Kansas corporation, was to build from the Missouri, near the Kansas River, to the one hundredth meridian.‡. The Hannibal and St. Joseph, a Missouri corporation, with the consent of Kansas, was to build into that State, either under its own franchise or one derived from Kansas.§ And so on. Every mile of road to be built within the limits of any State was to be built by a State corporation. And these several corporations received the same aid in bonds and lands from the United States as did the railroad company which is now here as the appellant in this case.

This corporation, we say, was formed for private trade

---

* This point, as the Reporter understands it, is on a north and south line, dividing Nebraska about equally.

† See Act of 1862, § 9.          ‡ Id.          § Id. § 10.

and private profit.   The service which it renders to the government is only an incident to its general business.   Its operations are only accidentally, they are not inseparably connected with those of the government.   Between it and the old Bank of the United States there is in this respect the widest possible distinction.   The bank, by the system of exchanges which it maintained between different sections of the country, was converted into a convenient agency for transferring the public funds from place to place.   Every bill drawn at one branch upon another, transmitted and paid, was an operation not only of which the government might avail itself, but it increased to a degree the facility of communication which the treasury had need of.   And the necessity to the treasury of the most facile and certain and efficient means for the transmission of funds was what justified the incorporation of the bank.   But who shall say of this railroad company, that the running of its daily trains is thus needful or useful to the government?

What are the services required of it by the government? They are stated to be to " transmit dispatches over said telegraph line, and transport mails, troops, and munitions of war, supplies, and public stores upon said railroad for the government."   Every grant of land ever made by Congress to a railroad has provided in the same terms for the same services.

Not to go farther back than 1850, the grant to Illinois in aid of what became the Illinois Central, contains this clause :*

"The said railroad and branches shall be and remain a public highway for the use of the United States, free from toll or other charge, upon the transportation of any property or troops of the United States."

And—

"The United States mail shall, at all times, be transported on the said railroad, under the direction of the Postoffice Department, at such price as the Congress may by law direct."

---

* 9 Stat. at Large, 467.

These exact words are found in the grant to Missouri, for the Hannibal and St. Joseph Railroad,[*] in that to Arkansas and Missouri,[†] to Minnesota,[‡] Iowa,[§] Florida and Alabama,[||] Alabama,[¶] Louisiana,[**] Wisconsin,[††] Michigan,[‡‡] Mississippi,[§§] and so on down to the last act of the kind passed by Congress.

The service stipulated for by Congress, to be rendered by every land-grant railroad in this country, is as large, as necessary, as valuable as that to be rendered by the company appellant. And yet, it will not be argued that all these agencies are rendering this service as the principal part of their business, and rendering only an incidental service to the public.

Congress has not interposed any claim of exemption on behalf of the government of the character set up by the appellant.

Neither the title of the act nor the terms used in the act have such reach or force.

The objects of the act, as declared in the eighteenth section,[||||] are twofold: first, to promote the public interest, &c.; and secondly, to secure to the government the use of the road. One of these objects was evidently as prominent in the mind of Congress as the other. The circumstances of the company's incorporation are matters of common knowledge. Congress was moved to pass the original act by the consideration, at the time greatly agitating the public mind, that the Pacific States and Territories, by reason of their separation from the other parts of the country, might follow the example of the Southern States and seek to withdraw from the Union. To bind those distant parts more closely to the rest, by the bands of commerce, was the argument most pressed upon Congress. Facility in the transportation of the mails, troops, and stores of the government was rather the incident to this broad and patriotic policy. So that

---

| | | |
|---|---|---|
| * 10 Stat. at Large, 9. | † Id. 156. | ‡ Ib. 302. |
| § 11 Id. 9. | || Ib. 16. | ¶ Ib. 18. |
| ** Ib. 19. | †† Ib. 20. | ‡‡ Ib. 22. |
| §§ Ib. 31. | |||| *Supra,* pp. 7, 8. | |

whether we regard the words of the acts or the circumstances of their passage, it is obvious that those services, on account of which exemption from State taxation is here claimed, must be considered incidental only.

There is nothing in this record to show that the taxes here complained of will interfere with or impair the efficiency of the railroad company in performing the service required of it by the acts. And if we look to the effect of taxation generally, upon the services to be rendered, nothing appears at all within the rule as laid down by Miller, J., in the *National Bank* v. *The Commonwealth.** Congress gave the corporation power to make contracts, which implies also the power to make debts. A creditor could sue his demand and recover judgment, and, by proper process, enforce it. These duties and liabilities would be as much interfered with by such judicial process as by sale for taxes; and the supreme rights of the government may as reasonably be interposed in one case as the other. Those rights, however, find their protection in the fact that, whether the property remains in the corporation or passes to another, it is bound to those duties and liabilities; that is to say, the purchaser takes the property subject to them in both instances.

There is no need of words to show that this tax is upon the property of the corporation and not upon its operations, and that it is not a constituent element in the government, but a third party made use of by it incidentally to render to it a certain service.

A private corporation, organized for private trade and private profit, rendering to the government a service incidentally in the course of its private business, and not inseparably connected with the government operations; not a constituent part of the machinery of the government, but called in to discharge a duty for which it is compensated; not claimed by Congress as an agency entitled to freedom from State control; its efficiency to discharge its duty, not impaired by the taxation complained of, and its property

---

* 9 Wallace, 353.

only, and not its operations, subjected to taxes;—this company must submit, in common with all citizens and all corporations, to those reasonable exactions which the State must make to support the government which gives protection and value to its business and its property.

. But this case has been substantially decided by this court. In *Osborne* v. *The United States Bank*, it is emphatically said that the circumstance that the bank was a Federal corporation was not important. The question, and the only question, there treated as vital was, what was the nature of the services required of it by the government?

In the bank-tax cases of *Van Allen* v. *The Assessor* and *National Bank* v. *The Commonwealth*, the distinction which we seek to maintain between what interests of a Federal corporation are taxable by a State and what non-taxable is clearly taken.

In *Thompson* v. *The Railroad Company*,* the services, duties, liabilities, relations of the company in question, were all precisely the same as those of this plaintiff. They were all imposed by these same acts we have been considering. In the words of section nine, of the first:.

"The Leavenworth, Pawnee, and Western Railroad Company of Kansas, are hereby authorized to construct a railroad and telegraph line . . . upon the same terms and conditions, in all respects, as are provided in this act for the construction of the Union Pacific Railroad."

. And yet those services, duties, liabilities, relations, grants, and subsidies did not secure the exemption sought. It is true that the opinion of the Chief Justice was confined to a State corporation. But put the case of *Osborne* v. *The Bank of the United States* with that case and the rule of this case is directly established. The case of *Thompson* v. *The Railroad Company* holds that a State corporation, rendering the same services, subject to the same duties and liabilities, sustaining the same relations as this appellant, must pay its State taxes. The case of *Osborne* v. *The Bank of the United States* holds

---

. * 9 Wallace, 579.

that a State corporation and a Federal corporation are on precisely the same footing in these respects. The conclusion covers this company.

And, after all, on plain principles, it must be so. Here is a corporation running the whole length of Nebraska, four hundred and fifty miles, owning millions of property, conducting an immense and profitable traffic. Every day it appeals to the officers of the State for protection. Why should it not contribute to the State a due share and portion of what is necessary to maintain the State's power of protecting it?

II. It is further objected that only eight miles of road is in Lincoln County, and that there is no provision of law for its authorities taxing what lies in the other sections. But the Revised Statutes of Nebraska provide that " all unorganized counties shall be attached to the nearest organized county directly east of them, for election, judicial, and revenue purposes." This seems conclusive.

*Reply :* The adjudications in the bank tax cases cited by the opposing counsel, or the reasoning upon which they rest, do not in the least impair the scope or vigor of the principles, and the authorities already cited by us, in their efficient protection from State taxation, of the means and agencies created by the General government, in execution of its constitutional powers. The cases mentioned simply hold that it is competent for Congress, in its establishment and arrangement of these means and agencies, to *concede* to the States such measure and modes of taxation, as *Congress* deems consistent with the safety and efficiency of these means and agencies, of executing the powers of the General government. This is taxation, not by predominance of State authority, but by favor of Federal submission of the subject to State taxation, upon motives of Federal policy. But this concession is not a judicial question. The *judicial* conclusion excludes the taxation of the States from the province of Federal means and agencies, and requires the *express* assent of Federal authority to support the State taxation, and fix its measure and its modes. To make the measure or mode

of State taxation, as allowable or excessive, a *judicial* question, is flatly repugnant to the celebrated cases cited, and subversive of their reasoning.*

The doctrine of this court, as declared in *Thompson* v. *Pacific Railroad*,† also much relied on by the opposing counsel, that the adoption by Congress of the aid or operation of *corporations created by the States,* in performing services in connection with the execution of the constitutional power of the Federal government (in the absence of all indication on the part of Congress that the State agencies so employed should be exempted, in consequence of such employment, from State taxation), does not exempt such State corporations from State taxation, has no application to the case of this Union Pacific Railroad Company, an incorporation of the General government confessedly, under acts of Congress. That decision rests upon the distinction between the case of the *employment* of the State corporation for a Federal service and the creation of a corporation as a Federal means and agency, within the discretion of Congress, for the execution of the constitutional powers of the General government. The court held that, in case of the employment of State corporations by Congress, it was competent for Congress to " exempt, in its discretion, the agencies employed in such services from any State taxation which will really prevent or impede the performance of them."

The only question, therefore, raised and decided by the court in this case was thus stated by the court:

" But can the right of this road to exemption from such taxation be maintained in the absence of any legislation of Congress to that effect ?"

The argument that the doctrine of the court in *McCulloch* v. *Maryland* exempted the Bank of the United States, with

---

* Bank of Commerce *v.* New York City, 2 Black, 620; Van Allen *v.* The Assessors, 3 Wallace, 592; The Banks *v.* The Mayor, 7 Id. 16; National Bank *v.* Commonwealth, 9 Id. 353.

† 9 Wallace, 579.

its branches, from taxation by the State of Maryland, although no express exemption was found in the charter, and that under that doctrine a *State corporation*, employed as an agent of the operations of the General government, was equally exempt, is thus disposed of by the court :*

" But it must be remembered that the Bank of the United States was a *corporation created by the United States ;* and, as an agent of the constitutional forms of the government, was endowed by the act of creation with all its faculties, powers, and functions. It did not owe its existence or any of its qualities to State legislation. And its exemption from taxation was put upon this ground."

And again :†

" The State tax, held to be repugnant to the Constitution, was imposed directly upon an operation or an instrument of the government. That such taxes cannot be imposed on the operations of the government is a proposition which needs no argument to support it. And the same reasoning will apply to instruments of the government created by itself for public and constitutional ends."

And the doctrine of the court is thus expressed : ‡

" But it will be safe to conclude, in general, *in reference to persons and State corporations employed in government service,* that when Congress has not interposed to protect their property from taxation, such taxation is not obnoxious to that objection " (*i. e.*, to the objection that the State taxation is used " to defeat or hinder the operations of the National government.")

The tax under consideration does not fall, as the counsel opposed to us argue, within the limitation suggested by the court, in *McCulloch* v. *Maryland*, and incorporated in the National Bank Act by Congress. The court say of the exemption asserted, that—

" It does not extend to a tax paid by the real property of the bank, in common with the other real property within the State, nor to a tax imposed on the interest which the citizens of Mary-

---

* Thompson *v.* Pacific Railroad, 9 Wallace, 589.

† Ib. 590.                        ‡ Ib. 591.

land may hold in this institution in common with other property of the same description throughout the State."

The tax of the State of Nebraska is not laid upon the shares of the Union Pacific Railroad Company held by citizens of that State, nor upon the real property of the company in common with the other real property within the. State. The tax is upon the universal possessions and resources of the company, as collected, combined, prepared, and applied, within the State, in the operations of the government services, for which this instrument was created and endowed by Congress. This tax, then, in the final proposition of the court, after the statement of the above limitation, " is a tax on the operation of an instrument employed by the government of the Union to carry its powers into execution. Such a tax must be unconstitutional."*

It is not necessary to suggest that the intimated liability in *McCulloch* v. *Maryland*, of the *real estate* of the bank to the State taxation, could not by parity of reason be held to expose the real estate of a railroad—the very *corpus* of its structure for the operations of the government for which the company was created and endowed—to State taxation. The real estate of the bank is manifestly referred to as of merely incidental, and not substantial, relation to the public uses of the bank, for which it was created by Congress.

No intendment can be drawn from the absence of any express exclusion of State taxation by the act of Congress, that the exposure of this company to State taxation was contemplated by Congress. The whole road, to which the act of incorporation applies, was within the Territories of the United States, and there was no State government whose operation needed to be considered or provided against by Congress. Manifestly, nothing could have been further from the expectations of the capitalists who entered into the enterprise proposed to them by the acts of Congress incorporating and endowing this company, than that their property invested in this National road was to be rated and taxed

---

* McCulloch *v.* Maryland, 4 Wheaton, 436.

to support the local government of the States that should come into being along its route. They accepted the established doctrines of this court as possessing, in the language of Chase, C. J., " the force of constitutional sanctions."

Mr. Justice STRONG delivered the judgment of the court.

That the taxing power of a State is one of its attributes of sovereignty; that it exists independently of the Constitution of the United States, and underived from that instrument; and that it may be exercised to an unlimited extent upon all property, trades, business, and avocations existing or carried on within the territorial boundaries of the State, except so far as it has been surrendered to the Federal government, either expressly or by necessary implication, are propositions that have often been asserted by this court. And in thus acknowledging the extent of the power to tax belonging to the States, we have declared that it is indispensable to their continued existence. No one ever doubted that before the adoption of the Constitution of the United States each of the States possessed unlimited power to tax, either directly or indirectly, all persons and property within their jurisdiction, alike by taxes on polls, or duties on internal production, manufacture, or use, except so far as such taxation was inconsistent with certain treaties which had been made. And the Constitution contains no express restriction of this power other than a prohibition to lay any duty of tonnage, or any impost, or duty on imports or exports, except what may be absolutely necessary for executing the State's inspection laws. As was said in *Lane County v. Oregon :** "In respect to property, business, and persons within their respective limits, the power of taxation of the States remained, and remains entire, notwithstanding the Constitution. It is, indeed, a concurrent power (concurrent with that of the General government), and in the case of a tax upon the same subject by both governments, the claim of the United States as the supreme authority must be pre-

---

* 7 Wallace, 77.

ferred; but with this qualification it is absolute. The extent to which it shall be exercised, the subjects upon which it shall be exercised, and the mode in which it shall be exercised, are all equally within the discretion of the legislatures to which the States commit the exercise of the power. That discretion is restrained only by the will of the people expressed in the State constitutions, or through elections, and by the condition that it must not be so used as to burden or embarrass the operations of the National government. There is nothing in the Constitution which contemplates or authorizes any direct abridgment of this power by National legislation. To the extent just indicated it is as complete in the States as the like power within the limits of the Constitution is complete in Congress." Such are the opinions we have expressed heretofore, and we adhere to them now.

There are, we admit, certain subjects of taxation which are withdrawn from the power of the States, not by any direct or express provision of the Federal Constitution, but by what may be regarded as its necessary implications. They grow out of our complex system of government, and out of the fact that the authority of the National government is legitimately exercised within the States. While it is true *that* government cannot exercise its power of taxation so as to destroy the State governments, or embarrass their lawful action, it is equally true that the States may not levy taxes the direct effect of which shall be to hinder the exercise of any powers which belong to the National government. The Constitution contemplates that none of those powers may be restrained by State legislation. But it is often a difficult question whether a tax imposed by a State does in fact invade the domain of the General government, or interfere with its operations to such an extent, or in such a manner, as to render it unwarranted. It cannot be that a State tax which remotely affects the efficient exercise of a Federal power is for that reason alone inhibited by the Constitution. To hold that would be to deny to the States all power to tax persons or property. Every tax levied by a

State withdraws from the reach of Federal taxation a portion of the property from which it is taken, and to that extent diminishes the subject upon which Federal taxes may be laid. The States are, and they must ever be, coexistent with the National government. Neither may destroy the other. Hence the Federal Constitution must receive a practical construction. Its limitations and its implied prohibitions must not be extended so far as to destroy the necessary powers of the States, or prevent their efficient exercise.

These observations are directly applicable to the case before us. It is insisted on behalf of the plaintiffs that the tax of which they complain has been laid upon an agent of the General government constituted and organized as an instrument to carry into effect the powers vested in that government by the Constitution, and it is claimed that such an agency is not subject to State taxation. That the Union Pacific Railroad Company was created to subserve, in part at least, the lawful purposes of the National government; that it was authorized to construct and maintain a railroad and telegraph line along the prescribed route, and that grants were made to it, and privileges conferred upon it, upon condition that it should at all times transmit dispatches over its telegraph line, and transport mails, troops, and munitions of war, supplies and public stores, upon the railroad for the government, whenever required to do so by any department thereof, and that the government should at all times have the preference in the use of the same for all the purposes aforesaid, must be conceded. Such are the plain provisions of its charter. So it was provided that in case of the refusal or failure of the company to redeem the bonds advanced to it by the government, or any part of them, when lawfully required by the Secretary of the Treasury, the road, with all the rights, functions, immunities, and appurtenances thereunto belonging, and also all lands granted to the company by the United States which at the time of the default should remain in the ownership of the company, might be taken possession of by the Secretary of the Treasury for the use and benefit of the United States. The char-

ter also contains other provisions looking to a supervision and control of the road and telegraph line, with the avowed purpose of securing to the government the use and benefit thereof for postal and military purposes. It is unnecessary to mention these in detail. They all look to a purpose of Congress to secure an agency competent and under obligation to perform certain offices for the General government. Notwithstanding this, the railroad and the telegraph line are neither in whole nor in part the property of the government. The ownership is in the complainants, a private corporation, though existing for the performance of public duties. The government owns none of its stock, and though it may appoint two of the directors, the right thus to appoint is plainly reserved for the sole purpose of enabling the enforcement of the engagements which the company assumed, the engagements to which we have already alluded.

Admitting, then, fully, as we do, that the company is an agent of the General government, designed to be employed, and actually employed, in the legitimate service of the government, both military and postal, does it necessarily follow that its property is exempt from State taxation?

In *Thompson v. The Union Pacific Railway Company*,\* after much consideration, we held that the property of that company was not exempt from State taxation, though their railroad was part of a system of roads constructed under the direction and authority of the United States, and largely for the uses and purposes of the General government. The company, in that case, were agents of the government, precisely as these claimants are, to the same extent and for the same purposes. Congress had made the same grants to them, and attached to the grants the same conditions. They, too, had received from Congress grants of land, and of bonds, and of a right of way for the purpose of aiding in the construction of their railroad and telegraph line, but with the condition that they should keep their railroad and telegraph line in repair and use, and should at all times transmit dis-

---

\* 9 Wallace, 579.

patches over their telegraph line, and transport mails, troops, and munitions of war, supplies and public stores, upon their railroad for the government, whenever required to do so by any department thereof, and that the government should at all times have the preference in the use thereof for the purposes aforesaid.   There is no difference which can be pointed out between the nature, extent, or purposes of their agency and those of the corporation complainants in the present case.   Yet, as we have said, a State tax upon the property of the company, its road-bed, rolling-stock, and personalty in general, was ruled by this court not to be in conflict with the Federal Constitution.   It may, therefore, be considered as settled that no constitutional implications prohibit a State tax upon the property of an agent of the government merely because it is the property of such an agent.   A contrary doctrine would greatly embarrass the States in the collection of their necessary revenue without any corresponding advantage to the United States.   A very large proportion of the property within the States is employed in execution of the powers of the government.   It belongs to governmental agents, and it is not only used, but it is necessary for their agencies.   United States mails, troops, and munitions of war are carried upon almost every railroad.   Telegraph lines are employed in the National service.   So are steamboats, horses, stage-coaches, foundries, ship-yards, and multitudes of manufacturing establishments.   They are the property of natural persons, or of corporations, who are instruments or agents of the General government, and they are the hands by which the objects of the government are attained.   Were they exempt from liability to contribute to the revenue of the States it is manifest the State governments would be paralyzed.   While it is of the utmost importance that all the powers vested by the Constitution of the United States in the General government should be preserved in full efficiency, and while recent events have called for the most unembarrassed exercise of many of those powers, it has never been decided that State taxation of such property is impliedly prohibited.

It is, however, insisted that the case of *Thompson* v. *The Union Pacific Railroad Company* differs from the case we have now in hand in the fact that it was incorporated by the Territorial legislature and the legislature of the State of Kansas, while these complainants were incorporated by Congress. We do not perceive that this presents any reason for the application of a rule different from that which was applied in the former case. It is true that, in the opinion delivered by the Chief Justice, reference was made to the fact that the defendants were a State corporation, and an argument was attempted to be drawn from this to distinguish the case from *McCulloch* v. *The State of Maryland.** But when the question is, as in the present case, whether the taxation of property is taxation of means, instruments, or agencies by which the United States carries out its powers, it is impossible to see how it can be pertinent to inquire whence the property originated, or from whom its present owners obtained it. The United States have no more ownership of the road authorized by Congress than they had in the road authorized by Kansas. f the taxation of either is unlawful, it is because the States cannot obstruct the exercise of National powers. As was said in *Weston* v. *Charleston,*† they cannot, by taxation or otherwise, "retard, impede, burden, or in any manner control the operation of the constitutional laws enacted by Congress to carry into execution the powers vested in the General government." The implied inhibition, if any exists, is against such obstruction, and that must be the same whether the corporation whose property is taxed was created by Congress or by a State legislature.

Nothing, we think, in the past decisions of this court is inconsistent with the opinions we now hold. *McCulloch* v. *The State of Maryland* and *Osborn* v. *Bank of the United States*‡ are much relied upon by the appellants, but an examination of what was decided in those cases will reveal that they are in full harmony with the doctrine that the property of an agent of the General government may be

---

* 4 Wheaton, 316.     † 2 Peters, 467.     ‡ 9 Wheaton, 738.

subjected to State taxation. In the former of those cases the tax held unconstitutional was laid upon the notes of the bank. The institution was prohibited from issuing notes at all except upon stamped paper furnished by the State, and to be paid for on delivery, the stamp upon each note being proportioned to its denomination. The tax, therefore, was not upon any property of the bank, but upon one of its operations, in fact, upon its right to exist as created. It was a direct impediment in the way of a governmental operation performed through the bank as an agent. It was a very different thing, both in its nature and effect, from a tax on the property of the bank. No wonder, then, that it was held illegal. But even in that case the court carefully limited the effect of the decision. It does not extend, said the Chief Justice, to a tax paid by the real property of the bank, in common with the other real property in the State, nor to a tax imposed on the interest which the citizens of Maryland may hold in the institution, in common with the other property of the same description throughout the State. But this is a tax on the operations of the bank, and is, consequently, a tax on the operations of an instrument employed by the government of the Union to carry its powers into execution. Such a tax must be unconstitutional. Here is a clear distinction made between a tax upon the property of a government agent and a tax upon the operations of the agent acting for the government.

In *Osborn* v. *The Bank* the tax held unconstitutional was a tax upon the existence of the bank — upon its right to transact business within the State of Ohio. It was, as it was intended to be, a direct impediment in the way of those acts which Congress, for National purposes, had authorized the bank to perform. For this reason the power of the State to direct it was denied, but at the same time it was declared by the court that the local property of the bank might be taxed, and, as in *McCulloch* v. *Maryland*, a difference was pointed out between a tax upon its property and one upon its action. In noticing an alleged resemblance between the bank and a government contractor, Chief Jus-

tice Marshall said: " Can a contractor for supplying a military post with provisions be restrained from making purchases within a State, or from transporting the provisions to the place at which the troops were stationed ? Or could he be fined or taxed for doing so ? We have not heard these questions answered in the affirmative. It is true the property of the contractor may be taxed; and so may the local property of the bank. But we do not admit that the act of purchasing, or of conveying the articles purchased, can be under State control." This distinction, so clearly drawn in the earlier decisions, between a tax on the property of a governmental agent, and a tax upon the action of such agent, or upon his right to be, has ever since been recognized. All State taxation which does not impair the agent's efficiency in the discharge of his duties to the government has been sustained when challenged, and a tax upon his property generally has not been regarded as beyond the power of a State to impose. In *National Bank v. The Commonwealth of Kentucky*,* when the right to tax National banks was under consideration, it was asserted by us that the doctrine cannot be maintained that banks, or other corporations or instrumentalities of the government, are to be wholly withdrawn from the operation of State legislation. Yet it was conceded that the agencies of the Federal government are uncontrollable by State legislation, so far as it may interfere with, or impair their efficiency in performing the functions by which they are designed to serve that government.

It is, therefore, manifest that exemption of Federal agencies from State taxation is dependent, not upon the nature of the agents, or upon the mode of their constitution, or upon the fact that they are agents, but upon the effect of the tax; that is, upon the question whether the tax does in truth deprive them of power to serve the government as they were intended to serve it, or does hinder the efficient exercise of their power. A tax upon their property has no such necessary effect. It leaves them free to discharge the duties they

---

* 9 Wallace, 353.

have undertaken to perform. A tax upon their operations is a direct obstruction to the exercise of Federal powers.

In this case the tax is laid upon the property of the railroad company precisely as was the tax complained of in *Thompson* v. *Union Pacific.* It is not imposed upon the franchises or the right of the company to exist and perform the functions for which it was brought into being. Nor is it laid upon any act which the company has been authorized to do. It is not the transmission of dispatches, nor the transportation of United States mails, or troops, or munitions of war that is taxed, but it is exclusively the real and personal property of the agent, taxed in common with all other property in the State of a similar character. It is impossible to maintain that this is an interference with the exercise of any power belonging to the General government, and if it is not, it is prohibited by no constitutional implication.

It remains only to notice one other position taken by the complainants. It is that if the act of the State under which the tax was laid be constitutional in its application to their property within Lincoln County, the property outside of Lincoln County is not lawfully taxable by the authorities of that county under the laws of the State. To this we are unable to give our assent. By the statutes of Nebraska the unorganized territory west of Lincoln County, and the unorganized county of Cheyenne, are attached to the county of Lincoln for judicial and revenue purposes. The authorities of that county, therefore, were the proper authorities to levy the tax upon the property thus placed under their charge for revenue purposes.

The decree of the Circuit Court is affirmed.

Mr. Justice SWAYNE, concurring in the judgment: I concur in the affirmance of the judgment in this case. I see no reason to doubt that it was the intention of Congress not to give the exemption claimed. The exercise of the power may be waived. But I hold that the road is a National instrumentality of such a character that Congress may interpose and protect it from State taxation whenever that body

shall deem it proper to do so.   For some of the leading authorities in support of the principle involved in this view of the subject I refer to the *Chicago and Northwestern Railway* v. *Fuller*,\* decided by this court a short time ago.

DECREE AFFIRMED.

Mr. Justice BRADLEY, with whom concurred Mr. Justice FIELD, dissenting.

One of the errors assigned to the decree of the court below is : That the State of Nebraska has no power to subject to taxation, for State purposes, the road-bed, rolling stock, and other property necessary for the use and operation of the complainants' road; and whether the State has such power is the controlling question in this cause.   In my judgment, no such power exists, and my opinion is based upon the principles established in the cases of *McCulloch* v. *Maryland*,† and *Osborn* v. *The United States Bank*.‡   Those principles, as summed up by Chief Justice Marshall himself, in the later case of *Weston* v. *The City of Charleston*,§ were as follows :

1. " That all subjects to which the sovereign power of a State extends, are objects of taxation; but those over which it does not extend are, upon the soundest principles, exempt from taxation."

2. " That the sovereignty of a State extends to everything which exists by its own authority, or is introduced by its permission; but not to those means which are employed by Congress to carry into execution powers conferred on that body by the people of the United States."

3. " That the attempt to use the power of taxation on the means employed by the government of the Union in pursuance of the Constitution, is itself an abuse, because it is the usurpation of a power which the people of a single State cannot give."

4. " That the States have no power by taxation, or otherwise, to retard, impede, burden, or in any manner control

---

\* 17 Wallace, 560.   † 4 Wheaton, 316.   ‡ 9 Id. 738.   § 2 Peters, 466.

the operation of the constitutional laws enacted by Congress, to carry into execution the powers vested in the General government."

If we needed an example to show that the application of these principles extends to such a case as the present, we could not frame one more to the purpose than that of the United States Bank, in respect to which they were announced in the cases referred to. The parallel between it and the Union Pacific Railroad is striking, and, for the purposes of the question, complete. In the case of the bank a *corporation* was created, with full banking powers. The capital stock was mostly subscribed by individuals, the government reserving an interest of seven millions out of thirty-five. Its affairs were managed by twenty-five directors, of whom five were appointed by the President of the United States, by and with the advice and consent of the Senate. The powers of the directors were defined and restricted by the charter. The Secretary of the Treasury was authorized, from time to time, to call upon the bank for a statement of its affairs. For the privileges and benefits conferred, the bank was required to pay to the United States a bonus of $1,500,000. The books of the bank were to be always open to the inspection of a committee of either house of Congress, appointed for that purpose. Penalties and forfeitures were imposed for the breach of certain limitations and directions; and, finally, the bills and notes of the bank were to be receivable in payment of public dues; the public moneys were to be deposited in the bank and its branches, unless the Secretary of the Treasury should otherwise order; and, on his requisition, the bank was to give the necessary facilities for transferring the public funds from place to place within the United States, and for distributing the same in payment of the public creditors, without charging commissions or exchange.* Here, then, was a corporation, constituted mainly of private individuals, created by Congress, established by its aid, regulated by its laws, amenable to its

---

* 3 Stat. at Large, 266.

committees and to the executive department, and subservient to the uses and purposes of the government, in executing and carrying out a particular part of its constitutional functions.

Now in all of these respects, except the single one of ownership of a portion of its capital stock, the Union Pacific Railroad presents a parallel case. The corporation is the creature of Congress; it receives large aid from the General government, both in donations and loans; the President appoints two of its directors; and all the operations of the company in laying, constructing, and working its railroad and telegraph lines, as well as its rates of toll, are subject to regulations imposed by its charter, and to such further regulations as Congress may hereafter make. On failure to comply with the terms and conditions of the charter, or to keep the road in repair and use, Congress may assume the control and management thereof, and devote the income to the use of the United States. Annual reports are to be made to the Secretary of the Treasury. The loan of the United States to the company, amounting to many millions, is a lien on all the property, and on failure to redeem it, the Secretary of the Treasury is authorized to take possession of the road, with all its rights, functions, immunities, and appurtenances, for the use and benefit of the United States; and, finally, all the grants made to the company are declared to be upon the condition that, besides paying the government bonds advanced, the company shall keep the railroad and telegraph lines in repair and use, and shall at all times transmit dispatches and transport mails, troops, and munitions of war, supplies and public stores for the government, whenever required to do so by any department thereof; and that the government shall have the preference at rates not to exceed those charged to private parties, and payable by being applied to the payment of the bonds aforesaid; and in addition to all this control of Congress, and the obligations and liabilities of the company, Congress reserves the right to add to, alter, amend, or repeal the charter.

In these provisions we see the same close connection be-

tween the government and the corporation, the same control reserved by the former, the same or an equal interest in the scheme, and a like creation of means for carrying into execution the powers conferred upon Congress. In the one case, the object was to facilitate the financial transactions of the government, and the bank was used as a means to that end; in the other, the object is to establish a National postroad for the mails, and a telegraph line for the transmission of intelligence, and to facilitate government transportation of every kind between the East and the West, as well as to promote and regulate the commerce between those sections; and the railroad company is used as a means to these ends.

It seems to me that unless we are prepared to overrule the decisions referred to, we must apply the same law to this case which was applied to the United States Bank. I trust we are not prepared to overrule those decisions. Whilst no one disputes the general power of taxation in the States, which is so elaborately set forth in the opinion of the majority, it must be conceded that there are limits to that power. The States cannot tax the powers, the operations, or the property of the United States, nor the means which it employs to carry its powers into execution. The government of the United States, within the scope of its powers, is supreme, and cannot be interfered with or impeded in their exercise.

The case differs *toto cœlo* from that wherein the government enters into a contract with an individual or corporation to perform services necessary for carrying on the functions of government—as for carrying the mails, or troops, or supplies, or for building ships or works for government use. In those cases the government has no further concern with the contractor than in his contract and its execution. It has no concern with his property or his faculties independent of that. How much he may be taxed by, or what duties he may be obliged to perform towards, his State is of no consequence to the government, so long as his contract and its execution are not interfered with. In that case the con-

tract is the means employed for carrying into execution the powers of the government, and the contract alone, and not the contractor, is exempt from taxation or other interference by the State government.

But where the General government creates a corporation as a means of carrying out a national object, that corporation and its powers, property, and faculties, employed in accomplishing the service, are the instrumentalities by which the government effects its objects. Hence the corporation is not taxable by State authority. And it matters not that private individuals are interested for their private gain in the stock of the corporation. Such individual interest may be taxable by itself, but the corporation and its property and operations cannot be, without interfering with the agencies used by the government for the accomplishment of its objects.

This distinction between private corporations performing services for the government and public corporations created by the government for the purpose of carrying on its operations, and the consequences resulting therefrom, are forcibly drawn by Chief Justice Marshall in *Osborn* v. *The United States Bank.* He says:

" The foundation of the argument in favor of the right to tax the bank is laid in the supposed character of that institution. The argument supposes the corporation to have been originated for the management of an individual concern, to be founded upon contract between individuals, having private trade and private profit for its great end and principal object. If these premises were true, the conclusion drawn from them would be inevitable. This mere private corporation, engaged in its own business, with its own views, would certainly be subject to the taxing power of the State, as any individual would be; and the casual circumstance of its being employed by the government in the transaction of its fiscal affairs would no more exempt its private business from the operation of that power than it would exempt the private business of any individual employed in the same manner. But the premises are not true. The bank is not

considered as a private corporation, whose principal object is individual trade and individual profit, but as a public corporation, created for public and national purposes. That the mere business of banking is, in its own nature, a private business, and may be carried on by individuals or companies, having no political connection with the government, is admitted; but the bank is not such an individual or company. It was not created for its own sake, or for private purposes. It has never been supposed that Congress could create such a corporation. The whole opinion of the court in *McCulloch* v. *Maryland* is founded on and sustained by the idea that the bank is an instrument which is necessary and proper for carrying into effect the powers vested in the government of the United States. It is not an instrument which the government found ready made, and has supposed to be adapted to its purposes, but one which was created in the form in which it now appears for national purposes only. It is, undoubtedly, capable of transacting private as well as public business. While it is the great instrument by which the fiscal operations of the government are effected, it is also trading with individuals for its own advantage. The appellants endeavor to distinguish between this trade and its agency for the public, between its banking operations and those qualities which it possesses in common with every corporation, such as individuality, immortality," &c.

The suggestion of Chief Justice Marshall in the above quotation, that Congress cannot create any corporations except for public and national purposes, is worthy of particular notice. The inference is obvious, that any corporation rightfully created by Congress, being necessarily public and national in its object, is beyond the reach of State taxation. That suggestion, it is true, was made in reference to a corporation established for business purposes within the States of the Union. And in such a case, it is evident that the proposition must be true, namely, that Congress cannot create a corporation except for a public and national purpose. But in a Territory of the United States, Congress is supreme, and is the fountain of local as well as public and national

law. It usually exercises its municipal powers over such Territories by the agency of Territorial governments. But it is not obliged to do this. It might exercise them directly, for the greater power includes the less. As the source of municipal legislation in the Territory of Nebraska, therefore, Congress undoubtedly could have established local and private corporations for manufacturing, mining, financial, and other business purposes, the same as it has been accustomed to do in reference to the District of Columbia, prior to the recent establishment of a legislature therein. Now, any such private and local corporations created by Congress in a Territory, would cease to be United States corporations when such Territory became a State. They would then become subject to State control by reason of not possessing a national character. A *quo warranto* from the State courts could be issued for the repeal of their charters in case of forfeiture for misfeasance or non-feasance. The admission of a Territory as a State would be a virtual assignment by Congress of all control over such institutions to the State as the proper successor in the municipal sovereignty. But this would not be the case with regard to corporations of a public and national character, such as Congress could have created if the Territory had been a State at the time. They will remain United States corporations, subject to Congressional, and not to State control.

The Union Pacific Railroad was authorized to be constructed entirely in Territories then belonging to the United States. But the work was public and national in its character, and the corporation was a public and national corporation, as much so as would be a company created by Congress to construct a railroad from New Orleans to New York, through the old or long-admitted States. The circumstance, therefore, that the road was originally authorized in the United States territory, does not detract from the importance of Chief Justice Marshall's suggestion in its bearing upon the case in hand. The very fact that the charter of the company can stand at all as a Congressional instead of a State charter, which has not been seriously questioned, is proof

of its national character; for without such national character it would cease to be subject to national control.

That Congress has the power under the Federal Constitution to create and establish such a corporation for such purposes of a national character was demonstrated by the unanswerable argument of Mr. Hamilton on the creation of the first National bank, and was set at rest by the equally unanswerable argument of Chief Justice Marshall in the case of *McCulloch* v. *Maryland.*

"Although among the enumerated powers of government," says the Chief Justice,* "we do not find the word 'bank' or 'incorporation,' we find the great powers to levy and collect taxes, to borrow money, to regulate commerce, to declare and conduct war, and to raise and support armies and navies. The sword and the purse, all the external relations, and no inconsiderable portion of the industry of the nation, are intrusted to its government. It can never be pretended that these vast powers draw after them others of inferior importance merely because they are inferior. Such an idea can never be advanced. But it may with great reason be contended that a government intrusted with such ample powers, on the due execution of which the happiness and prosperity of the nation so vitally depends, must also be intrusted with ample means for their execution. The power being given, it is the interest of the nation to facilitate its execution. . . . Throughout this vast republic, from the St. Croix to the Gulf of Mexico, from the Atlantic to the Pacific, revenue is to be collected and expended, armies are to be marched and supported. The exigencies of the nation may require that the treasure raised in the North should be transferred to the South, that raised in the East conveyed to the West, or that this order should be reversed. Is that construction of the Constitution to be preferred which would render these operations difficult, hazardous, and expensive? . . . The government which has the right to do an act, and has imposed on it the duty of performing that act, must, ac-

---

* 4 Wheaton, 407.

cording to the dictates of reason, be allowed to select the means; and those who contend that it may not select any appropriate means, that one particular mode of effecting the object is excepted, take upon themselves the burden of establishing that exception. . . . The power of creating a corporation, though appertaining to sovereignty, is not, like the power of making war, or levying taxes, or of regulating commerce, a great substantive and independent power, which cannot be implied as incidental to other powers, or used as a means of executing them. It is never the end for which other powers are exercised, but a means by which other objects are accomplished. No contributions are made to charity for the sake of an incorporation, but a corporation is created to administer the charity; no seminary of learning is instituted in order to be incorporated, but the corporate character is conferred to subserve the purposes of education. No city was ever built with the sole object of being incorporated, but is incorporated as affording the best means of being well governed. The power of creating a corporation is never used for its own sake, but for the purpose of effecting something else. No sufficient reason is, therefore, perceived why it may not pass as incidental to those powers which are expressly given, if it be a direct mode of executing them."

Now, I think it cannot be doubted at the present day, whatever may have been contended in former times, that the creation of national roads and other means of communication between the States, is within the power of Congress in carrying out the powers of regulating commerce between the States, establishing postoffices and postroads, and in providing for the national defence and for military operations in time of war. And no one will contend that, if the creation of a corporation is a suitable agency and means of carrying on the financial operations of the government, the creation of a corporation is equally apposite as an agency and means of carrying out the objects above mentioned. This has been so forcibly stated by one of the justices of this court, in the case of The Clinton Bridge, decided in the

Eighth Circuit, in October, 1867,* that I shall not further enlarge upon the point.

The Union Pacific Railroad Company, therefore, being a United States corporation created for national objects and purposes, and deriving its existence, its powers, its duties, its liabilities, from the United States alone; being responsible to the United States, now as formerly, for a whole congeries of duties and observances; being subjected to the forfeiture of its corporate franchises, powers, and property to the United States, and not to any individual State; being charged with important duties connected with the very functions of the government: every consideration adduced in the cases of *McCulloch* v. *Maryland*, and *Osborn* v. *The Bank*, would seem to require that it should be exempt not only from State taxation, but from State control and interference, except so far as relates to the preservation of the peace, and the performance of its obligations and contracts. In reference to these and to the ordinary police regulations imposed for sanitary purposes and the preservation of good order, of course, it is amenable to State and local laws.

As an instrument of national commerce as well as government operations, it has been regulated by Congress. Can it be further regulated by State legislation? Can the State alter its route, its gauge, its connections, its fares, its franchises, or any part of its charter? Can the State step in between it and the superior power or sovereignty to which it is responsible? Such an hypothesis, it seems to me, is inadmissible and repugnant to the necessary relations arising and existing in the case. Such an hypothesis would greatly derogate from and render almost useless and ineffective that hitherto unexecuted power of Congress to regulate commerce by land, among the several States. If it be declared in advance that no agency of such commerce, which Congress may hereafter establish, can be freed from local impositions, taxation, and tolls, the hopes of future free and un-

---

* 1 Woolworth, 150.

restricted intercourse between all parts of this great country will be greatly discouraged and repressed.

These considerations show how totally different this case is from that of *Thompson* v. *The Kansas Pacific Railroad Company.* That was a State corporation, deriving its origin from State laws, and subject to State regulation and responsibilities. It would be subversive of all our ideas of the necessary independence of the National and State governments, acting in their respective spheres, for the General government to take the management, control, and regulation of State corporations out of the hands of the State to which they owe their existence, without its consent, or to attempt to exonerate them from the performance of any duties, or the payment of any taxes or contributions, to which their position, as creatures of State legislation, renders them liable.

But, it may be asked, if the States cannot tax a United States corporation created for public and national purposes, on what principle can the General government tax local corporations created by the State governments for local and State purposes? If the States cannot tax a National bank, how can the United States tax a State bank? The answer is very manifest, and is stated by Chief Justice Marshall in *McCulloch* v. *Maryland.** "The government of the Union, though limited in its powers, is supreme within its sphere of action. This would seem to result necessarily from its nature. It is the government of all; its powers are delegated by all; it represents all, and acts for all. Though any one State may be willing to control its operations, no State is willing to allow others to control them." Again: "It has also been insisted that, as the power of taxation in the General and State governments is acknowledged to be concurrent, every argument which would sustain the right of the General government to tax banks chartered by the States, will equally sustain the right of the States to tax banks chartered by the General government. But the two cases are not on the same reason. The people of all the States have

---

* 4 Wheaton, 405.

created the General government, and have conferred upon it the general power of taxation. The people of all the States, and the States themselves, are represented in Congress, and, by their representatives, exercise this power. When they tax the chartered institutions of the States, they tax their constituents; and these taxes must be uniform. But when a State taxes the operations of the government of the United States, it acts upon institutions created, not by their own constituents, but by the people over whom they claim no control. It acts upon the measures of a government created by others as well as themselves, for the benefit of others in common with themselves. The difference is that which always exists, and always must exist, between the action of the whole on a part, and the action of a part on the whole—between the laws of a government declared to be supreme, and those of a government which, when in opposition to those laws, is not supreme."

But it is contended that the laying of a tax on the road-bed of the company is nothing more than laying a tax on ordinary real estate, which was conceded might be done in the case of the United States Bank, in reference to its banking-house or other lands taken for claims due in the course of its business. This is a plausible suggestion, but in my apprehension, not a sound one. In ascertaining what is essential in every case, respect must always be had to the subject-matter. The State of Maryland undertook to tax the circulation of the United States branch bank established in that State by requiring stamps to be affixed thereto; the State of Ohio imposed a general tax of $50,000 upon the branch established therein. These taxes were declared unconstitutional and void. They impeded the operations of the bank as a financial agent. Real estate was not a necessary appurtenant to the exercise of the functions of the bank. It might hire rooms for its office, or it might purchase or erect a building.

But the primary object of a railroad company is commerce and transportation. In its case, a railroad track is just as essential to its operations as the use of a currency, or the

issue or purchase of bills of exchange is to the operations of a bank. To tax the road is to tax the very instrumentality which Congress desired to establish, and to operate which it created the corporation.

Besides, all that a railroad company possesses in reference to its road-bed is the right of way, and the right to use the land for the purpose of way. This is a franchise conferred by the government, and inseparately connected with the other franchises which enable it to perform the duties for the performance of which it was created. Any estate in the land—the soil—the underlying earth—beyond this, belongs to the original proprietor; and that proprietor in the present case is the government itself. So that, look at it what way we will, there is no room for the taxing power of the State. The estate in the soil cannot be taxed, for that remains in the United States; the franchise of right of way and materials of track cannot be taxed, because they are essentially connected with and form a part of the powers, faculties, and capital by which the national purposes of the organization are accomplished.

If the road-bed may be taxed, it may be seized and sold for non-payment of taxes—seized and sold in parts and parcels, separated by county or State lines—and thus the whole purpose of Congress in creating the corporation and establishing the line may be subverted and destroyed.

In my judgment, the tax laid in this case was an unconstitutional interference with the instrumentalities created by the National government in carrying out the objects and powers conferred upon it by the Constitution.

Mr. Justice HUNT: I dissent from the opinion of the court.