PULLMAN'S PALACE CAR CO. *v.* TWOMBLY, Treas., etc., and others.

(*Circuit Court, S. D. Iowa.* January 14, 1887.)

1. TAXATION—EXEMPTION—PROPERTY USED FOR PURPOSES OF INTERSTATE COMMERCE.

Property is not exempted from liability to an equal and uniform property tax by the fact that it is used, either partially or exclusively, for interstate commerce.

2. SAME—VEHICLES OF TRANSPORTATION—DOMICILE.

Vehicles of transportation, used constantly and continuously upon a single run, acquire a *situs,* for purposes of taxation, independent and irrespective of the domicile of the owner.

3. SAME—EFFECT OF VEHICLE'S USE IN DIFFERENT STATES.

Such *situs* is not destroyed by the fact that the owner, owning many vehicles of like character, and having lines in various parts of the United States, transfers from time to time such vehicles from one line to another, providing a constant and continuous use of such vehicles is preserved upon the single run.

4. SAME—CONFLICT BETWEEN TWO STATES.

Where such vehicles are used upon a run extending through two states, there is a *situs* for taxation in each state to a fair proportion of the value of the property so used.

5. SAME—RESTRAINING COLLECTION OR PAYMENT OF A TAX.

Where a state tax is assessed and levied against a railroad company owning and operating a line of road within the state, based upon the rolling stock used by it in the operation of such road, a third party cannot enjoin the state from collecting, or the railroad company from paying, a portion of such tax, on the ground that a part of such rolling stock included in such assessment is the property of such third party, and exempt from taxation.

In Equity. Motion for injunction.

*Alfred Ennis*, for complainant.

*A. J. Baker*, Atty. Gen., for defendants.

BREWER, J. This is, in substance, a bill brought by the complainant to restrain the state of Iowa from collecting from certain railroad companies doing business in that state a portion of the taxes levied upon them, on the ground that the basis of the assessment upon which such portion of the taxes was levied was a number of sleeping, drawing-room, and parlor cars, belonging to complainant, and used only in interstate commerce. It appears that the complainant is a foreign corporation, created under the laws of the state of Illinois, and domiciled in Cook county, in that state. It is engaged in the business of manufacturing, using, and hiring to be used, sleeping, drawing-room, and parlor cars. It has certain contracts with the various railroads running through the state of Iowa, by which it furnishes to them such cars under contracts providing for their use and operation. In a general way, it may be said that the interior management of these cars remains with the complainant, the exterior with the railroad companies, who receive also the full pay for the mere transportation of passengers. These cars are all used in interstate commerce; that is, all of them run from points outside of the state of Iowa into or into and through the state of Iowa, or from points in the state of Iowa to points outside the state.

Complainant, therefore, insists that, being instrumentalities used exclusively for interstate commerce, and the domicile of the owner being outside of the state, they are exempt from taxation by the state; and, further, that, as the complainant itself cannot be taxed upon such cars, the state cannot do indirectly what it cannot do directly, and cannot, therefore, subject them to taxation by assessing them to the several railroad companies by whom they are in fact used and operated. Obviously, it becomes important to see exactly what the state of Iowa is attempting to do.

The following are the statutes under which the assessment and levy complained of were made:

Sec. 1317. On the first Monday of March in each year the executive council shall assess all the property of each railway corporation in this state, excepting the lands, lots, and other real estate belonging thereto not used in the operation of any railway.

Sec. 1318. The president, vice-president, or general superintendent, and such other officers as such council may designate, of any corporation operating any railway in this state, shall furnish said council, on or before the fifteenth day of February in each year, a statement, signed and sworn to by one of such officers, showing in detail, for the year ending on January the 1st preceding, (1) the whole number of miles owned, operated, or leased in the state by such corporation making the return, and the value thereof per mile, with a detailed statement of all property of every kind, and the value, located in each county in the state; (2) also a detailed statement of the number, and the value thereof, of engines, passenger, mail, express, baggage, freight, and other cars, or property used in operating or repairing such railway, in this state; and, on railways which are part of lines extending beyond the limits of this state, the returns shall show the actual amount of rolling stock in use on the corporation's line in the state during the year for which return is made. The return shall show *the amount of rolling stock,* the gross earnings of the entire railway, and the gross earnings of the same in this state, and all property designated in the next section, and such other facts as such council may, in writing, require. If such officers fail to make such statement, said council shall proceed to assess the property of the corporation so failing, adding 30 per cent. to the assessable value thereof.

Sec. 1319. The said property shall be valued *at its true cash value,* and such assessment shall be made upon the *entire railway within the state,* and shall include the right of way, road-bed, bridges, culverts, rolling stock, depots, station grounds, shops, buildings, gravel beds, and all other property, real and personal, exclusively used in the operation of such railway. In assessing said railway, and its *equipments,* said council shall take into consideration the gross earnings per mile for the year ending January the 1st preceding, and any and all other matters necessary to enable said council to make a just and equitable assessment of said railway property. If a part of any railway is without this state, then, in estimating the value of its rolling stock and movable property, they shall take into consideration the proportion which the business of that part of the railway lying within the state bears to the business of the railway without the state. Such valuation shall be in the same ratio as that of the property of individuals.

Sec. 1320. On or before the twenty-fifth day of March, in each year, said council shall transmit to the county auditor of each county through which any railway may run a statement showing the length of the main track of such railway within the county, and the assessed value per mile of the same, as fixed by a *pro rata* distribution per mile of the assessed value of the whole property named in the preceding section. Said statement shall be entered on the proper record of the county.

Sec. 1321. At the first meeting of the board of supervisors held after said statement is received by the county auditor they shall make, and cause the same to be entered in the proper record, an order stating and declaring the length of the main track, and the assessed value of such railway lying in each city, town, township, or lesser taxing district in their county through which said railway runs, as fixed by the executive council, which shall constitute the taxable value of said property for taxable purposes; and the taxes on said property, when collected by the county treasurer, shall be paid over to the persons or corporations entitled thereto as other taxes, and the county auditor shall transmit a copy of said order to the city council, or trustees of such city, incorporated town, or township.

Sec. 1322. All such railway property shall be taxable upon said assessment at the same rates, by the same officers, and for the same purposes, as the property of individuals within such counties, cities, towns, townships, and lesser taxing districts.

Sec. 1323. The provisions of this chapter in relation to transporting of passengers shall not apply to any railway in this state until the gross earnings of the preceding year, reckoning from the first day of January.of each year, shall equal or exceed the sum of $4,000 per mile average, for all the miles of road operated during the whole of that preceding year.

*(Chapter 114, Laws 1878.)*

An act to tax sleeping and dining cars, amending section 1318, c. 5, tit. 10, of the Code:

Section 1. Be it enacted by the general assembly of the state of Iowa, that, in addition to the matters required to be contained in the statement provided for in section 1318 of the Code, such statement shall show the number of sleeping and dining cars not owned by such corporation, but used by it in operating its railway in this state during each month of the year for which the return is made, and also the number of miles each month that said cars have been run or operated on such railway within the state, and the total number of miles that said cars have been run or operated each month within and without the state.

Sec. 2. The executive council shall, at the time of the assessment of other railway property for taxation, assess for taxation the average number of cars so used by such corporation each month, and the assessed value of said cars shall bear the same proportion to the entire value thereof that the monthly average number of miles that such cars have been run or operated within the state shall bear to the monthly average number of miles that such cars have been used or operated within and without the state. Such *valuation shall be in the same ratio as that of the property of individuals*.

Sec. 3. The executive council shall, as provided by sections 1318 and 1319 of the Code, first assess the value of the property of the corporation using sleeping and dining cars not owned by such corporation, and shall then add to such valuation the amount of the assessed valuation of said sleeping and dining cars, made as hereinbefore provided, and such aggregate amount shall constitute and be considered the assessed value of the property *of such corporation* for the purposes of taxation.

Approved March 25, 1878.

From these statutes it is obvious—*First*, that no tax is assessed against the complainant, a non-resident corporation, but only against corporations created by, or doing business and domiciled in, the state; *second*, the tax is solely a property tax, with rate or assessment and levy the same as obtains in respect to other personal property. It will also be noticed that, in order to be perfectly fair and just, where any rolling stock is used partly in and partly out of the state, only that proportion of value based upon the amount of use within the state is considered as the basis of taxation. In other words, the state aims to tax that property which it protects, and only to the extent that it furnishes protection. If it cannot do this, it requires but a moment's reflection to see that the state will be shorn of much of what every candid man must feel to be honest revenue. Sleeping cars are not the only vehicles used in interstate commerce. A vast amount of rolling stock used on the various interstate railroads belongs to car trust companies, and is simply leased by the

railroad companies. Is it taxable only in the eastern cities in which the car trust companies are domiciled? More than that, how many interstate railroads, traversing often several states, are owned and operated by a corporation created by and domiciled in a single state? Has that state alone the power of taxation?

Now, as stated, the claim of complainant is that, because this property is used in interstate commerce, it is exempt from state taxation at any other place than the domicile of its owner. I deny the proposition, and affirm the law to be that personal property, continuously used in a state, acquires a *situs* in that state for purposes of taxation, and may, at the option of the state, be subjected to an equal property tax, and that notwithstanding it be used exclusively in interstate commerce. The state is sovereign, except as limited by the federal constitution. A sovereign may tax all property within its jurisdiction, and, unless there be found in the federal constitution some provision taking away this power, the state of Iowa may unquestionably tax this property used within its territorial limits. *Lane Co.* v. *Oregon*, 7 Wall. 77; *Ward* v. *Maryland*; 12 Wall. 427; *Railroad Co.* v. *Peniston*, 18 Wall. 5.

The restriction on the power of the state is claimed alone by virtue of clause 3 of section 8 of article 1 of the constitution of the United States, which grants to congress the power "to regulate commerce with foreign nations, and among the several states." I insist that an equal and uniform property tax is not a regulation of congress, although it reaches to and affects property used in interstate commerce. Such a tax is not similar to a license or occupation tax. They are conditions of, or restrictions upon, the doing of the business, while the former is simply a subjection of the property employed in the business to the common burden of state support. A citizen of Canada, with his only domicile there, may build in the city of Des Moines a sleeping car. It remains idle and unused. The duty of the state to protect that property for its owner is clear, and equally clear its correlative right to subject it to ordinary taxation. To provide protection costs money, and the tax is the owner's proper payment therefor. The car may be employed in commerce, and run continuously from Davenport to Council Bluffs. The duty of protection and the right of taxation confessedly remain unchanged. Next year it extends its run across the Mississippi river, to Rock Island. The duty of protection remains. Has the right of taxation gone? Must both Iowa and Illinois pay for furnishing this citizen of Canada protection to his property, and neither have a right to exact any compensation therefor? Does the regulation of interstate commerce compel such an absurdity and wrong? If the imposition of an equal and uniform property tax upon the vehicles used in interstate commerce be a regulation of commerce, the domicile of the owner and the *situs* of the property are immaterial questions. The use determines the exemption, and all such property is released from every burden of state taxation. If it be a regulation of commerce to impose such a tax in Iowa, where the property is found, it is equally so in Illinois, where the owner is domiciled. Surely, such a sweeping exemption was never within the

contemplation of the framers of the federal constitution in granting the power to congress to regulate interstate commerce.

If we turn to the decisions of the supreme court, we find an almost constant affirmation of the power of the state to levy a property tax upon the vehicles and instrumentalities of interstate commerce.

Thus, in *The Passenger Cases,* 7 How. 283, is this language:

"A state cannot regulate foreign commerce, but it may do many things which more or less affect it. It may tax a ship or other vessel used in commerce, the same as other property owned by its citizens. A state may tax the stages in which the mail is transported, but this does not regulate the conveyance of the mail any more than taxing a ship regulates commerce; and yet, in both instances, the tax on the property in some degree affects its use."

In *Morgan* v. *Parham,* 16 Wall. 471, the court says:

"A steam-boat or a post-coach, engaged in a local business within a state, may be subject to local taxation, although it carry the mail of the United States. The commerce between the states may not be interfered with by taxation or otherwise, but its instruments and vehicles may be. It is not, therefore, upon this principle that we decide this case."

And in the late case of *Gloucester Ferry Co.* v. *Pennsylvania,* 5 Sup. Ct. Rep. 829, it is said:

"It is true that the property of corporations engaged in foreign or interstate commerce, as well as the property of corporations engaged in other business, is subject to state taxation, provided, always, it be within the jurisdiction of the state. As said by Chief Justice MARSHALL in *McCulloch* v. *Maryland,* 4 Wheat. 429: 'All subjects over which the sovereign power of a state extends are objects of taxation, but those over which it does not extend are, upon the soundest principles, exempt from taxation. This proposition may almost be pronounced self-evident.'"

And further, (page 832:)

"It is solely, therefore, for the business of the company in landing and receiving passengers at the wharf in Philadelphia that the tax is laid, and that business, as already said, is an essential part of the transportation between the states of New Jersey and Pennsylvania, which is itself interstate commerce. While it is conceded that the property in a state belonging to a foreign corporation, engaged in foreign or interstate commerce, may be taxed equally with like property of a domestic corporation engaged in that business, we are clear that a tax or other burden imposed on the property of either corporation because it is used to carry on that commerce, etc., is invalid," etc.

No case can be found in which the supreme court have declared a mere property tax void, on the ground that the property upon which it was imposed was employed in interstate commerce. Strong support of the views above expressed is found in the rulings of the supreme court upon state taxation of the agencies of the federal government.

In the case of *McCulloch* v. *Maryland,* 4 Wheat. 310, a state tax upon notes of the United States Bank was declared unconstitutional, and in *Osborn* v. *Bank of U. S.,* 9 Wheat. 738, a similar tax upon the right of the bank to do business in the state of Ohio was also held illegal. These decisions were upon the ground that the taxes were an impediment upon the free operations of the agencies of the federal government.

In *Railroad Co.* v. *Peniston*, 18 Wall. 5, an attempt was made to carry the doctrine of these cases further, and to the extent of exempting the Union Pacific Railroad Company from liability for any state taxes upon its real and personal property. But the court refused to sanction this extension of the doctrine, and held that the railroad company, although a corporation created by an act of congress, the recipient of large bounty from the general government, and subject to the obligation of carrying its troops, mails, etc., was not exempt from state taxation on its real and personal property. The first syllabus in the case is as follows:

"The exemption of agencies of the federal government from taxation by the state is dependent, not upon the nature of the agents, nor upon the mode of their constitution, nor upon the fact that they are agents, but upon the effect of the tax; that is, upon the question whether the tax does in truth deprive them of power to serve the government as they were intended to serve it, or hinder the efficient exercise of their power. A tax upon their *property* merely, having no such necessary effect, and leaving them free to discharge the duties they have undertaken to perform, may be rightfully laid by the states. A tax upon their *operations*, being a direct obstruction to the exercise of federal powers, may not be."

And in the course of the opinion the court uses this language to illustrate the distinction between this case and the prior ones, and to point out the extent to which those former cases went:

"*McCulloch* v. *Maryland* and *Osborn* v. *Bank of U. S.* are much relied upon by the appellants, but an examination of what was decided in those cases will reveal that they are in full harmony with the doctrine that the property of an agent of the general government may be subjected to state taxation. In the former of those cases the tax held unconstitutional was laid upon the notes of the bank. The institution was prohibited from issuing notes at all, except upon stamped paper furnished by the state, and to be paid for on delivery; the stamp upon each note being proportioned to its denomination. The tax, therefore, was not upon any property of the bank, but upon one of its operations; in fact, upon its right to exist as created. It was a direct impediment in the way of a governmental operation, performed through the bank as an agent. It was a very different thing, both in its nature and effect, from a tax on the property of the bank. No wonder, then, that it was held illegal. But even in that case the court carefully limited the effect of the decision. It does not extend, said the chief justice, to a tax paid by the real property of the bank, in common with the other real property in the state, nor to a tax imposed on the interest which the citizens of Maryland may hold in the institution, in common with the other property of the same description throughout the state. But this is a tax on the operations of the bank, and is, consequently, a tax on the operations of an instrument employed by the government of the Union to carry its powers into execution. Such a tax must be unconstitutional. Here is a clear distinction made between a tax upon the property of a government agent and a tax upon the operations of the agent acting for the government.

"In *Osborn* v. *Bank* the tax held unconstitutional was a tax upon the existence of the bank,—upon its right to transact business within the state of Ohio. It was, as it was intended to be, a direct impediment in the way of those acts which congress, for national purposes, had authorized the bank to perform. For this reason the power of the state to direct it was denied, but, at the same time, it was declared by the court that the local property of the bank might be taxed; and, as in *McCulloch* v. *Maryland*, a difference was pointed out between

a tax upon its property and one upon its action. In noticing an alleged resemblance between the bank and a government contractor, Chief Justice MARSHALL said: 'Can a contractor for supplying a military post with provisions be restrained from making purchases within a state, or from transporting the provisions to the place at which the troops were stationed? Or could he be fined or taxed for doing so? We have not heard these questions answered in the affirmative. It is true the property of the contractor may be taxed, and so may the local property of the bank. But we do not admit that the act of purchasing, or of conveying the articles purchased, can be under state control. This distinction, so clearly drawn in the earlier decisions, between a tax on the property of a governmental agent and a tax upon the action of such agent, or upon his right to be, has ever since been recognized. All state taxation which does not impair the agent's efficiency in the discharge of his duties to the government has been sustained when challenged, and a tax upon his property generally has not been regarded as beyond the power of a state to impose.' "

It seems to me clear, from these considerations, that the mere use of property in interstate commerce does not exempt it from the burdens of an equal and uniform state property tax.

Neither does the domicile of the owner furnish, in the present case, any basis of exemption. It is true that the domicile of the owner (the complainant) is in the state of Illinois, and that for many purposes the *situs* of personal property is the domicile of the owner. *Mobilia sequuntur personam.* But, for purposes of taxation, tangible property has a *situs* wherever it is found. *Railroad Co.* v. *Pennsylvania*, 15 Wall. 300. Now, these cars—tangible property—are found, and found continuously, in the state of Iowa. This is not the case of a car owned in another state making a single trip through the state of Iowa, and then returned to the state where it belongs. Such temporary transit, it may be conceded, would not change the *situs* of the property. It is also true, according to the allegations of the bill, that the complainant, being the owner of a thousand or more sleeping cars in use throughout the United States, frequently changes cars from one run to another, so that identically the same cars may not be continuously in use in the state of Iowa. But this interchange does not abridge the statement that there is a continuous and constant use in the state of Iowa of the sleeping cars belonging to the complainant, and, being thus continuously and constantly used in that state, they acquire a *situs* there for the purposes of taxation. As to other tangible property, it goes without saying that its continued presence in a state gives it a local *situs* for purposes of taxation. It is doubtless within the legislative power, by suitable enactment, to establish a *situs* for personal property elsewhere than at the place where it is found, and this fact interprets several decisions of the supreme court. The place in which a vessel is registered is, by law, its home port. That is considered its *situs*.

In *Hays* v. *Pacific Mail S. S. Co.*, 17 How. 596, the defendant, a corporation of New York, owned steam-vessels employed in the transportation of passengers and freight between New York and San Francisco, which were registered in New York. The court held that place of registry the *situs* of the property for taxation, and that the mere fact that

the vessels stopped temporarily in the ports of California to load and unload did not give the property a *situs* there for purposes of taxation.

The same proposition controlled the decision in *Morgan* v. *Parham*, 16 Wall. 471. That was an extreme case, for the vessel was engaged in the coasting trade between Mobile and New Orleans, and had been absent from New York city for years, yet in its opinion the court uses this language:

"The jurisdiction of this court over the present case, as in the case of *Hays* v. *Pacific Mail S. S. Co.*, arises from the facts—*First*, that the property had not become blended with the business and commerce of Alabama, but remained legally of and as in New York; and, *secondly*, that the vessel was lawfully engaged in the interstate trade over the public waters. It is in law as if the vessel had never before been within the port of Mobile, but, touching there on a single occasion, when engaged in the interstate trade, had been subjected to a tax as personal property of that city. Within the authorities it is an interference with the commerce of the country not permitted to the states."

An attempt is made to place commerce by land in the same position as commerce by water, and to make in the former case the domicile of the owner equivalent to the port of registry in the latter. But until there has been some legislative declaration of equivalent import the obvious distinction between the two must be enforced, and the ordinary rule of the *situs* of tangible personal property for purposes of taxation be applied to vehicles used in commerce on land.

The distinction between the two modes of commerce is clearly recognized by the supreme court in *Railroad Co.* v. *Maryland*, 21 Wall., where, at page 470, Mr. Justice BRADLEY says:

"Commerce on land, between the different states, is so strikingly dissimilar in many respects from commerce on water that it is often difficult to regard them in the same aspect in reference to the respective constitutional powers and duties of the state and federal government. Maritime transportation requires no artificial roadway. Nature has prepared to hand that portion of the instrumentality employed. The navigable waters of the earth are recognized public highways of trade and intercourse. No franchise is needed to enable the navigator to use them. Again, the vehicles of commerce by water being instruments of intercommunication with other nations, the regulation of them is assumed by the national legislation, so that state interference by water is clearly marked and distinctly discernible. But it is different by land."

I have thus far assumed that the property in question was used exclusively for interstate commerce, but such is not the fact. It is alleged in the bill "that the same cars also transport passengers from points in Iowa to other points in said state, whenever they properly apply for such transportation, but the number of such passengers is very small, compared with the number of other passengers transported in such cars." It thus appears that these cars are used partly for commerce wholly within the state of Iowa. Can a vehicle, used partly for intrastate commerce, escape entire state taxation on the ground that it is also used partly for interstate commerce?

The case of *Wabash, St. L. & Pac. R. Co.* v. *Illinois,* 7 Sup. Ct. Rep. 4, (decided at the October, 1886, term of the United States supreme court,) while holding that the state might not regulate the tariff on freight transported interstate, conceded that it could so regulate the intrastate tariff. If the same car carried freight from a place within the state to one also within, and still other freight to a place without the state, would the two transportations in the same car destroy the state's power to regulate the tariff on either? I think this, however, is a minor matter. I have thus endeavored to show that, if this tax had been assessed and levied directly against the complainant upon its property continuously used in the state of Iowa, it would have to be sustained as a valid exercise of power on the part of the state; but the fact is that no tax has been attempted to be collected from complainant. As the bill discloses, the state has simply assessed and levied the ordinary property tax against certain railroad corporations, some its own creations, and all owning and operating lines of railroad within its territory, the basis of the assessment being only the property used by them in the operation of their lines within the state. May not the state enforce such a tax? Can a third party challenge the basis of that assessment? May it enjoin those corporations from payment on the ground that they have not a complete title to all the property they use? Suppose the tax be illegal, may not the railroad companies pay it, if they choose? They may prefer to pay, rather than forfeit the good-will of the people of Iowa, or provoke them to the imposition of severer burdens. A stockholder in those corporations would not be heard, unless he showed that he had used all reasonable efforts to compel the corporations themselves to act. Has a third party, with no interest in the corporations, a better right? If the tax is illegal, and the companies nevertheless pay it, they cannot recover it from the complainant. It would not be estopped by their action to challenge its validity.

Counsel for complainant say that while there may be no legal obligation on complainant's part to reimburse the railroad corporations this tax, yet it must keep on good terms with them, and will therefore feel obliged to reimburse them. It seems strange to me to ask a court of equity to enjoin a state from receiving a tax which the party against whom it is assessed is willing to pay, simply for the sake of keeping two corporations on good terms. I think it more important to permit the willing tax-payer to keep on good terms with the people of the state. Suppose the railroad corporations do not pay, and the tax is sought to be collected by warrant. That will run against the corporations, and not against the complainant. If any of its property is seized, replevin an action at law will furnish adequate relief, and there is no need of the interposition of a court of equity. So, for this reason also, I think the complainant must fail.

It now remains for me to notice the cases presented by counsel for complainant in support of their bill.

First, the case of *Crandall* v. *Nevada,* 6 Wall. 35, in which a capitation tax of one dollar, attempted to be levied by the state of Nevada for each passenger passing through the state by stage-coach or railroad, to be

paid by the carrier, was declared illegal, and beyond the power of the state. That was no property tax, but, in effect, a tax on the business of transportation. Yet even that decision was not placed on the ground of conflict with said section 8, but mainly rested on the proposition that such a tax tended to prevent the free passage of the citizen to and from the federal capital.

*St. Louis* v. *Ferry Co.*, 11 Wall. 423. In this case it appeared that an Illinois corporation owned a ferry privilege across the Mississippi, at St. Louis. When not in use, its boats were laid up on the Illinois shore, and forbidden to remain at the wharf in St. Louis. It paid a ferry license and wharfage tax to the city of St. Louis. In addition, the city authorities assessed a tax on the company for the value of the boats as property within the city.

Similar in its facts is the case of *Gloucester Ferry Co.* v. *Pennsylvania*, 114 U. S. 196; S. C. 5 Sup. Ct. Rep. 826. In both cases the tax was held illegal. While called a tax on the property, the court regarded it as a tax on the business, because the boats, by simply touching the wharf for the purposes of loading and unloading, did not become a part of the property within the city. In the latter case, as we have already seen, the right to tax the instrumentalities of interstate commerce was expressly conceded.

*Carlisle* v. *Pullman P. C. Co.*, 8 Colo. 320; S. C. 7 Pac. Rep. 164. In this case the only question was as to the mode of assessment and taxation. The power of the state was affirmed.

*Tennessee* v. *Pullman S. Car Co.*, decided in the circuit by Mr. Justice MATTHEWS, 22 Fed. Rep. 276; opinion of the supreme court by Mr. Justice BLATCHFORD, 117 U. S. 34; S. C. 6 Sup. Ct. Rep. 635. In that case it was decided that the levying of a privilege tax by the state of Tennessee was a regulation of commerce. The legislation of the state required the payment of $50 per car for the privilege of running through the state. That this was an attempt to regulate the business is apparent, and, as such, was declared beyond the power of the state. It is true that in both opinions may be found some general expressions which, taken by themselves, and disconnected from the precise question before the courts, go very strongly to sustain the general claim of exemption asserted by complainant. But it has been well and often said that the true way to construe the language of an opinion is to take it as applied simply to the facts and the question under consideration. Especially is that true in a case like this, where, unless so limited, it contradicts the oft-repeated prior declarations of that court. The same comment may be made upon the opinion in the case of *Wabash R. Co.* v. *Illinois, supra*, in which the only question was as to the power of a state to prescribe the terms of interstate tariff.

These are the cases relied on by complainant, and in them I find nothing which I deem sufficient to overthrow the reasoning and authority heretofore presented.

My conclusion, therefore, is (1) that property is not exempted from liability to an equal and uniform property tax by the fact that it is used, either partially or exclusively, for interstate commerce; (2) that vehicles

of transportation, used constantly and continuously upon a single run, acquire a *situs*, for purposes of taxation, independent and irrespective of the domicile of the owner; (3) such *situs* is not destroyed by the fact that the owner, owning many vehicles of like character, and having lines in various parts of the United States, transfers from time to time such vehicles from one line to another, providing a constant and continuous use of such vehicles is preserved upon the single run; (4) where such vehicles are used upon a run extending through two states, there is a *situs* for taxation in each state to a fair proportion of the value of the property so used; (5) where a state tax is assessed and levied against a railroad company owning and operating a line of road within the state, based upon the rolling stock used by it in the operation of such road, a third party cannot enjoin the state from collecting, or the railroad company from paying, a portion of such tax, on the ground that a part of such rolling stock included in such assessment is the property of such third party, and exempt from taxation.

Entertaining these views, the restraining order heretofore granted will be set aside, and the application for a temporary injunction denied.